# United States Court of Appeals for the Federal Circuit

2006-1485


SANGO INTERNATIONAL L.P.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

WARD MANUFACTURING, INC.
and ANVIL INTERNATIONAL, INC.,

Defendants-Appellees.


William D. Outman, II, Baker & McKenzie, LLP, of Washington, DC, argued for plaintiff-appellant.  With him on the brief were Stuart P. Seidel and Kevin J. Sullivan.

David Silverbrand, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States.  With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Kemba Eneas, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.  Of counsel were John D. McInerney, Chief Counsel, and Berniece A. Browne, Senior Litigation Counsel.

Roger B. Schagrin, Schagrin Associates, of Washington, DC, argued for defendants-appellees Ward Manufacturing, Inc., et al.  Of counsel were Michael J. Brown and Brian E. McGill.


Appealed from:     United States Court of International Trade

Judge Judith M. Barzilay

# United States Court of Appeals for the Federal Circuit

2006-1485

SANGO INTERNATIONAL, L.P.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

WARD MANUFACTURING, INC.
and ANVIL INTERNATIONAL, INC.,

Defendants-Appellees,

---

DECIDED: May 2, 2007

---

Before NEWMAN, SCHALL, and MOORE, <u>Circuit Judges</u>.

SCHALL, <u>Circuit Judge</u>.

Sango International, L.P. ("Sango") appeals the decision of the United States Court of International Trade upholding the determination of the Department of Commerce ("Commerce") that Sango's imported gas meter swivels and gas meter nuts are within the scope of an antidumping order covering malleable iron pipe fittings, other

than grooved fittings, from the People's Republic of China. See Sango Int'l L.P. v. United States (CIT Decision), 429 F. Supp. 2d 1356 (Ct. Int'l Trade 2006). Because we conclude that Commerce's decision is not supported by substantial evidence, we reverse the decision of the Court of International Trade and remand the case for further proceedings consistent with this opinion.

BACKGROUND

I.

The antidumping laws protect United States industries against the domestic sale of foreign manufactured goods at prices below the fair market value of those goods in the foreign country. AIMCOR v. United States, 141 F.3d 1098, 1101 (Fed. Cir. 1998); see also Allegheny Ludlum Corp. v. United States, 287 F.3d 1365, 1368 (Fed. Cir. 2002) ("Under the statutory scheme established by the Tariff Act of 1930 . . . American industries may petition for relief from imports that are sold in the United States at less than fair value ('dumped'), or which benefit from subsidies provided by foreign governments."). If a less-than-fair-value sale of imported goods results in actual or threatened injury to the corresponding domestic industry, a duty may be imposed on the imported merchandise. Micron Tech., Inc. v. United States, 117 F.3d 1386, 1389 (Fed. Cir. 1997). The duty is "equal to the amount by which the normal value exceeds the export price . . . for the merchandise."[1] RHP Bearings Ltd. v. United States, 288 F.3d 1334, 1337 (Fed. Cir. 2002) (quoting 19 U.S.C. § 1673).

---

[1] The "normal value" is "the price at which the subject merchandise is first sold . . . for consumption in the exporting country." 19 U.S.C. § 1677b. The "export price" is "the price at which the subject merchandise is first sold . . . in the United States." Id. § 1677a.

An antidumping investigation is initiated when a domestic industry petitions Commerce to investigate allegations of dumping by foreign manufacturers. Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1089 (Fed. Cir. 2002). In due course, Commerce makes a preliminary determination as to whether the imported merchandise is being sold, or is likely to be sold, at less than fair value. 19 U.S.C. § 1673b(b)(1)(A). While Commerce is making its preliminary determination, the International Trade Commission ("Commission") makes a preliminary determination as to whether there is a "reasonable indication" that an industry in the United States is "materially injured or is threatened with material injury . . . by reason of imports of the subject merchandise [or] that imports of the subject merchandise are not negligible." Id. § 1673b(a)(1). If the investigation is not terminated at the preliminary stage, Commerce makes its final determination as to less-than-fair-value sales, or the likelihood of less-than-fair-value sales, in the United States. Id. § 1673d(a)(1). At the same time, the Commission finalizes its determination as to the existence or threat of material injury. Id. § 1673d(b)(1). If both the less-than-fair-value inquiry by Commerce and the injury inquiry by the Commission are "answered in the affirmative," Commerce issues the appropriate antidumping order. Duferco Steel, 296 F.3d at 1089; see 19 U.S.C. § 1673d(c)(2).

II.

On October 30, 2002, Commerce received an antidumping petition from Anvil International, Inc. ("Anvil") and Ward Manufacturing, Inc. ("Ward"), domestic manufacturers of pipe fittings, asking Commerce to investigate the importation of malleable iron pipe fittings, other than grooved fittings, from the People's Republic of

China.  Pipe fittings are formed connector pieces that are used in the construction of piping systems.

In the section of the petition describing the scope of the investigation, Anvil and Ward stated that the goods at issue were currently classified under item numbers 7307.19.90.30, 7307.19.90.60, and 7307.19.90.80 of the Harmonized Tariff Schedule ("HTSUS").[2]  Petition for the Imposition of Antidumping Duties: Malleable Iron Pipe Fittings from China, at 6 (Oct. 30, 2002) ("Antidumping Petition").  They further stated, however, that "[t]he product description of the subject merchandise, and not HTSUS classifications, should be dispositive of whether merchandise is covered by this petition."  Id.  Turning to the uses of the goods at issue, Ward and Anvil stated that "the principle uses of malleable iron pipe fittings are in gas lines, piping systems of oil refineries, and gas and water systems of buildings."  Id. at 4.  Finally, the petition provided information concerning the specifications and characteristics of the pipe fittings:

---

[2]     HTSUS heading 7307.19.90.30 covers "Tube or pipe fittings (for example, couplings, elbows, sleeves), of iron or steel: Cast fittings: Other: Other Unions."  HTSUS heading 7307.19.90.60 covers "Tube or pipe fittings (for example, couplings, elbows, sleeves), of iron or steel: Cast fittings: Other: Other Other: Other: Threaded."  HTSUS heading 7307.19.90.80 covers "Tube or pipe fittings (for example, couplings, elbows, sleeves), of iron or steel: Cast fittings: Other: Other Other: Other: Other."

Malleable iron fittings are produced to the American Society for Testing and Materials (ASTM) standard A-126(A) . . . . The fittings are threaded to the American National Standards (ANSI) specifications. They are available in many configurations, the most common being 90 degree elbows, tees, couplings, crosses, and unions. They are produced in both black (ungalvanized) and galvanized form . . . . Normally, the ungalvanized fittings are produced to ASTM A-197 specifications and threaded to B.16.14 specifications, and the galvanized fittings are made to ASTM A-153 specifications and threaded to B.16.14 specifications. Malleable pipe fittings are normally threaded and attached to pipe by screwing. . . . The grooved fittings which are excluded from the scope of this investigation and like product are a completely different form of fitting, in which split couplings are attached to a circumferential groove close to the end of each piece to be joined. A gasket inside the coupling seals against the pipe and the coupling.

Id. at 4-5.

One of the fittings covered by the petition, an elbow fitting, is depicted below.



An elbow fitting allows two pieces of pipe to be connected, and permits the resulting connection to turn ninety degrees. Pipe is threaded into each opening in the elbow. Tees and crosses are similar to elbows but have three and four openings (threaded for pipe connections), respectively. The threads on both the pipe and the fittings conform to ANSI B1.20.1, which specifies National Pipe Thread ("NPT"). CIT Decision, 429 F. Supp. 2d at 1361; Antidumping Petition, at 4.

2006-1485                                  5

In its Notice of Initiation of the antidumping investigation, Commerce set forth the scope of the products included in the investigation:

> [T]he products covered are shipments of certain malleable iron pipe fittings, cast, other than grooved fittings, from the People's Republic of China. The merchandise is classified under item numbers 7307.19.90.30, 7307.19.90.60 and 7307.19.90.80 of the Harmonized Tariff Schedule. HTSUS subheadings are provided for convenience and customs purposes. The written description of the scope of this proceeding is dispositive.

Notice of Initiation of Antidumping Duty Investigation: Certain Malleable Iron Pipe Fittings From the People's Republic of China, 67 Fed. Reg. 70,579 (Nov. 25, 2002). On December 12, 2003, following the investigation by Commerce and the Commission that resulted from the Anvil and Ward petition, Commerce issued an antidumping order titled Certain Malleable Iron Pipe Fittings, Cast, Other Than Grooved, from the People's Republic of China ("Order"). CIT Decision, 429 F. Supp. 2d at 1357 (citing 68 Fed. Reg. 69,376 (Dec. 12, 2003)). The Order covered the following products:

> certain malleable iron pipe fittings, cast, other than grooved fittings, from the People's Republic of China. The merchandise is classified under item numbers 7307.19.90.30, 7307.19.90.60 and 7307.19.90.80 of the Harmonized Tariff Schedule (HTSUS). Excluded from the scope of this order are metal compression couplings, which are imported under HTSUS number 7307.19.90.80. A metal compression coupling consists of a coupling body, two gaskets, and two compression nuts. These products range in diameter from 1/2 inch to 2 inches and are carried only in galvanized finish. Although HTSUS subheadings are provided for convenience and U.S. Customs and Border Protection (CBP) purposes, the Department's written description of the scope of this proceeding is dispositive.

Id. at 1357-58.

III.

Sango is a United States manufacturer that insulates gas meter swivels and nuts. Id. at 1358. Gas meter swivels are used to connect a gas meter to a piping system. A swivel has the standard NPT threaded connection on one side[3] and a shaped flange with a notch on the other side. The shaped flange mates with a gas meter through the use of a gas meter nut. Because of the flange connection, the gas meter swivels can only connect to pipe on one side and a gas meter on the other side. Typical gas meter swivels are shown below.



As indicated, a gas meter nut is used to connect a gas meter swivel to a gas meter. Below is a typical gas meter nut.



---

[3] The parties dispute whether the NPT threaded end of a swivel can connect to pipe or only a pipe fitting. Anvil and Ward assert that a swivel can have either male or female threads, which would allow the swivel to connect directly to pipe. Sango argues that a swivel cannot connect to pipe without a fitting and that the drawings relied on by Anvil and Ward "depict articles in use midway in the last century and last updated in January, 1981." In other words, the parties dispute whether gas meter swivels are currently sold with a female threaded end.

Gas meter swivels and nuts are manufactured to ANSI standard B109.1, which covers Diaphragm Type Gas Displacement Meters.

During the period following the issuance of the Order, Sango caused to be imported into the United States from the People's Republic of China gas meter swivels and nuts. Upon entry, Customs classified the swivels and nuts under HTSUS 7307.19.90.60. On December 21, 2004 and February 9, 2005, Customs rejected Sango's claim that the goods should be classified under HTSUS 9028.90.00, as parts and accessories to gas meters. In reaching its conclusion, Customs explained that the swivels and nuts work together to connect a pipe elbow to a gas meter by screwing. Customs determined that the meter swivels and nuts were thus parts of general use that should be classified under HTSUS heading 7307. This determination resulted in the swivels and nuts being covered by the Order, since the Order states that the merchandise subject to it "is classified under item numbers 7307.19.90.30, 7307.19.90.60 and 7307.19.90.80 of the Harmonized Tariff Schedule."[4] Id. at 1357-58.

---

[4] We have been informed by the parties that, pursuant to an order of the Court of International Trade, the goods will not be liquidated until the resolution of all appeals.

IV.

There is no statutory provision governing the interpretation of the scope of antidumping orders. However, pursuant to 19 C.F.R. § 351.225(c)(1), an importer may request a scope ruling as to whether a particular product is covered by an antidumping order.[5] Upon receipt of a request for a scope ruling, Commerce conducts an inquiry into whether the product is covered by the antidumping order at issue. This inquiry is governed by regulation:

> [I]n considering whether a particular product is included within the scope of an order or a suspended investigation, the Secretary [of Commerce] will take into account the following:
> (1) The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the [International Trade] Commission.
> (2) When the above criteria are not dispositive, the Secretary [of Commerce] will further consider:
> (i) The physical characteristics of the product;
> (ii) The expectations of the ultimate purchasers;
> (iii) The ultimate use of the product;
> (iv) The channels of trade in which the product is sold; and
> (v) The manner in which the product is advertised and displayed.

---

[5] In its entirety, section 351.225(c)(1) reads,

Contents and service of application. Any interested party may apply for a ruling as to whether a particular product is within the scope of an order or a suspended investigation. The application must be served upon all parties on the scope service list described in paragraph (n) of this section, and must contain the following, to the extent reasonably available to the interested party:
(i) A detailed description of the product, including its technical characteristics and uses, and its current U.S. Tariff Classification number;
(ii) A statement of the interested party's position as to whether the product is within the scope of an order or a suspended investigation, including:
(A) A summary of the reasons for this conclusion,
(B) Citations to any applicable statutory authority, and
(C) Any factual information supporting this position, including excerpts from portions of the Secretary's or the Commission's investigation, and relevant prior scope rulings.

2006-1485                                9

19 C.F.R. § 351.225(k).

If Commerce "can determine, based solely upon the application [for a scope ruling] and the descriptions of the merchandise referred to in paragraph (k)(1) of . . . section [351.225], whether a product is included within the scope of an order . . ., the Secretary will issue a final ruling."  19 C.F.R. § 351.225(d).  If Commerce cannot so determine, Commerce will initiate a scope inquiry.  Id. § 351.225(e).

On July 28, 2004, Sango requested a scope ruling that would exclude gas meter swivels and nuts from the coverage of the Order.  Anvil and Ward submitted comments to Commerce arguing that the swivels and nuts should be covered by the Order because they are "malleable iron pipe fittings which are cast and that are not grooved fittings and are not compression fittings."  CIT Decision, 429 F. Supp. 2d at 1358.

On September 13, 2004, Commerce decided that a formal scope inquiry was required because it was "unable to determine conclusively that meter swivels and meter nuts are pipe fittings and are treated as such within the industry."  Id. (quoting 19 C.F.R. § 351.225(e) (internal quotation marks omitted)).  Thereafter, in accordance with 19 C.F.R. § 351.225(k)(1), Commerce analyzed the Order, the antidumping petition, the initial investigation, and its determinations and the determinations of the Commission to determine whether the gas meter swivels and nuts were within the scope of the Order.  Id. at 1358-59; see 19 C.F.R. § 351.225(k)(1).  Commerce found these sources dispositive and on January 11, 2005, issued a ruling in which it determined that the swivels and nuts were within the scope of the Order, stating as follows:

First, these products are manufactured from malleable iron using a casting process in the PRC. Second, these products are indisputably "fittings;" they are "pipe fittings" because they are parts of a piping system, they direct the flow of the gas through a piping system, and can be, although are not always, connected to other pipe fittings or pipes. Finally, they are neither grooved fittings nor compression couplings, both of which are specifically excluded.

CIT Decision, 429 F. Supp. 2d at 1359 (citing United States Department of Commerce, Final Scope Ruling on Whether Meter Swivels and Meter Nuts Are Excluded from the Scope of the Antidumping Duty Order on Malleable Iron Pipe Fittings from the People's Republic of China, at 12 (Jan. 11, 2005) ("Scope Ruling")).

V.

Pursuant to 19 U.S.C. § 1516a(a)(2), Sango timely filed suit in the Court of International Trade to challenge Commerce's scope ruling, and Ward and Anvil intervened. Id. In due course, Sango moved for judgment on the administrative record, arguing that gas meter swivels and nuts are unambiguously outside the scope of the Order and, in the alternative, that Commerce's scope ruling was invalid because it failed to consider the criteria set forth in 19 C.F.R. § 351.225(k)(2).[6] Id. at 1361-62.

Addressing Sango's motion, the Court of International Trade examined "'the antidumping petition, the factual findings and legal conclusions adduced from the administrative investigations, and the preliminary order.'" Id. at 1360 (quoting Duferco Steel, 296 F.3d at 1097). The court explained that the "language of the order receives the greatest weight." Id. The court also reviewed the Commission's publications and

---

[6] The criteria listed in 19 C.F.R. §351.225(k)(2) are sometimes referred to as the Diversified Products criteria, after Diversified Products Corp. v. United States. 6 Ct. Int'l Trade 155 (1983).

administrative documents concerning the antidumping investigation, on the ground that those items served to "flesh out the meaning of the Order's text." Id. at 1361. The court noted that the Commission had explained that

> [p]ipe fittings generally are used for connecting the bores of two or more pipes or tubes, connecting a pipe to some other apparatus, changing the direction of fluid flow, or closing the pipe. The material from which MCIPF [malleable cast iron pipe fittings] are made, cast iron, is a general term for alloys composed primarily of iron, carbon (greater than two percent) and silicon.

Id. (quoting United States International Trade Commission, Malleable Iron Pipe Fitting from China: Determination and Views of the Commission, Investigation No. 731-TA-1021 (Preliminary), at 5 (Dec. 2002)) (alterations in original).

The Court of International Trade concluded that "the products are cast, made of malleable iron, manufactured in the PRC, and do not fall within the express exceptions within the Order." Id. at 1362. On this basis, the court determined that it "must uphold . . . Commerce's Scope Ruling as supported by substantial evidence and in accordance with law." Id. This appeal by Sango followed. We have jurisdiction over a final decision of the Court of International Trade pursuant to 28 U.S.C. § 1295(a)(5).

DISCUSSION

I.

We reapply the standard of review employed by the Court of International Trade. Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369 (Fed. Cir. 1998). That means that we must uphold a scope ruling unless we find it to be "unsupported by substantial evidence on the record or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support the conclusion reached. Consol. Edison v. Nat'l

<u>Labor Relations Bd.</u>, 305 U.S. 197, 229 (1938). The substantial evidence inquiry takes into account both the evidence that supports and detracts from the conclusion reached. See <u>Nippon Steel Corp. v. United States</u>, 458 F.3d 1345, 1352 (Fed. Cir. 2006).

II.

Sango argues that gas meter swivels and nuts are distinct articles of commerce outside the scope of the Order. Sango states that the only part of a gas meter swivel that meets ANSI Standard B1.20.1 (NPT) is the one end that connects to a pipe fitting. Sango explains that the other end of a gas meter swivel is flanged and "specially designed to join with the gas meter, and this flanged end cannot join to any pipe or any other section of a gas piping system." At the same time, Sango points out that pipe fittings, which are covered by the Order, are manufactured to meet ANSI standard B1.20.1, while gas meter swivels and nuts are manufactured to a different ANSI standard, B109.1, which covers Diaphragm Type Gas Displacement Meters. Sango points out that the threading of a gas meter nuts is straight (as opposed to the NPT tapered threading, specified by ANSI standard B1.20.1), which precludes a gas meter nut from being threaded together with any pipe or pipe fitting.

Sango argues that the essential characteristic of pipe fittings is that they "join[] together two lengths of, or cap[], a pipe." It further argues that the swivels do not connect to pipe, and that at most they connect to pipe fittings, which are not pipe. Sango urges that the gas meter nut is "even less susceptible to characterization as a pipe fitting. It is never used for connecting the bores of two or more pipes together."

Sango asserts that these facts show Commerce's determination was not supported by substantial evidence. Sango states that, in its scope ruling, Commerce basically relied upon three considerations: 1) the gas meter swivels and nuts are manufactured from malleable iron using a casting process in China; 2) they are indisputably "fittings"; and 3) the products are neither grooved fittings nor compression couplings, which are expressly excluded from the scope of the Order. Pointing to the evidence just noted, however, Sango argues that "[t]here is no proof of record . . . that gas meter swivels and gas meter nuts are 'indisputably' fittings." Finally, Sango urges that the fact that gas meter swivels and nuts are not expressly excluded from the scope of the Order does not mean that they are included: "[a] gas meter is not specifically excluded nor is a valve or length of pipe. They are clearly not pipe fittings."

Sango asks us to direct the Court of International Trade to remand to Commerce with the instruction that Commerce find that gas meter swivels and gas meter nuts are outside the scope of the Order. In the alternative, it argues that because the criteria under 19 C.F.R. § 351.225(k)(1) are not dispositive, we should direct the Court of International Trade to remand to Commerce for a scope determination after consideration of the criteria set forth in 19 C.F.R. § 351.225(k)(2).

The government and intervenors Anvil and Ward respond that the Court of International Trade correctly upheld Commerce's determination as supported by substantial evidence. The government argues that the threaded connection on the meter swivels is an NPT connection, a "characteristic of all pipe fittings." The government further argues that "the record . . . contains schematics of the gas piping system of which meter swivels and meter nuts are an integral part." The government

urges that Sango's arguments represent an effort "to circumvent the language of the [O]rder by distinguishing the meter swivels and meter nuts from other pipe fittings based upon the specialized use of meter swivels and meter nuts, as well as the fact that they are manufactured according to different specifications than other malleable iron pipe fittings." According to the government, the "plain language of the [O]rder does not specify any manufacturing standards, but, rather, only provides a description of the subject merchandise in general terms, as required by regulation."

III.

Section 351.225(k) states that when the criteria set forth in section 351.225(k)(1)—the description of the merchandise contained in the antidumping petition, the initial investigation by Commerce and the Commission, and the determinations of Commerce and the Commission—are not "dispositive," then Commerce must, in issuing its scope ruling, "further consider" the criteria set forth in section 351.225(k)(2). "Dispositive" means "[h]aving the quality or function of directing, controlling, or disposing of something." Oxford English Dictionary (2d ed. 1989); see Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1351 (Fed. Cir. 2006) (consulting dictionaries to construe statutory terms). For present purposes, it seems to us that "controlling" is the key part of the definition. Thus, we think that to be "dispositive," the section 351.225(k)(1) criteria must be "controlling" of the scope inquiry in the sense that they definitively answer the scope question. Viewing the evidence of record, we are constrained to agree with Sango's alternative argument that Commerce's conclusion that the criteria set forth in 19 C.F.R. § 351.225(k)(1) are dispositive of whether the gas meter swivels and the gas meter nuts are within the scope of the Order is not supported

by substantial evidence. Put another way, we cannot say that substantial evidence supports the proposition that the section 351.225(k)(1) criteria definitively answer the scope question in this case.

The evidence relating to the section 351.255(k)(1) criteria—the antidumping petition, the initial antidumping investigation, and the determinations of Commerce and the Commission—demonstrates that the focus of the antidumping investigation was on what one would consider traditional pipe fittings. The antidumping petition states that pipe fittings are "normally threaded and attached to pipe by screwing." Further, the petition distinguishes grooved fittings, explaining that they are "a completely different form of fitting" because of the way in which they mate with and seal pipe. Antidumping Petition, at 5; see United States International Trade Commission, Malleable Iron Pipe Fittings from China: Determination and Views of the Commission, Investigation No. 731-TA-1021 (Final), at I-6 to I-7 (Dec. 2003). At the same time, Commerce's Notice of Initiation of the antidumping investigation, the Commission's Preliminary Determination, and Commerce's Final Determination all refer to "certain malleable iron pipe fittings, cast, other than grooved, from the People's Republic of China," adding that "[t]he merchandise is classified under item numbers 7307.19.90.30, 7307.19.90.60 and 7307.19.90.80." As seen in footnote 2, these headings cover what one would consider to be traditional pipe fittings, one of which (an elbow) is depicted above. Finally, as already seen, the fittings covered by the Order are manufactured to ANSI standard B1.20.1. That standard, titled "Pipe Threads, General Purpose (Inch)," provides for NPT connections that utilize tapered threads.

We think that the evidence suggests that Sango's gas meter swivels and gas meter nuts differ from the pipe fittings covered by the Order. The gas meter swivel and gas meter nut depicted above are typical of the items illustrated in the copy of the brochure that Sango submitted to Commerce on October 4, 2004, and that Commerce accepted in connection with the scope determination proceedings. As indicated, the swivel that is depicted has a male thread at one end and a special flange and notch at the other. The male threaded end cannot connect directly to pipe (which, as we understand the parties' arguments, always has a male thread at each end) but, to the extent relevant here, only to a pipe fitting. The flanged end will only fit over and mate to a dry, diaphragm-type gas meter through the use of a gas meter nut. Gas meter swivels are cast in accordance with the ASTM A-197 specification for Cupola Malleable Iron. An article so manufactured is denominated as a Meter Class Connection under ANSI Standard B109.1, which covers Diaphragm Type Gas Displacement Meters. ANSI standard B109.1 specifies non-NPT threaded meter connections according to the size of the gas meter.[7] ANSI standard B109.1 differs from ANSI standard B1.20.1 (the standard governing fittings covered by the Order) in that ANSI B109.1 provides a standard for manufacturing and installing a gas meter, including the non-NPT connections for the meter. The flanged end of a gas meter swivel must be produced to ANSI B109.1 to mate with one of the Connection Dimensions set forth in Appendix A to ANSI B109.1. These dimensions are designated, for example, as 5 Lt., 10 Lt., terms of reference that are specific to gas meters and not to pipe fittings. The swivels and nuts

---

[7] One exception in ANSI B109.1 is that a 1" Pittsburgh-style meter does use NPT threaded connections.

comply with ANSI B109.1 and allow the transition from the gas meter to the piping system.  To accomplish this, the end of the swivel that mates with the piping system complies with ANSI B1.20.1 and utilizes NPT.

For its part, the gas meter nut also is manufactured to ANSI B109.1 specifications.  It must have thread specifications meeting one of the connection designations set forth in Appendix B to ANSI B109.1.  The thread size of a gas meter nut is controlled by the size of the meter connection.  For example, a 5 Lt. gas meter nut can only thread onto a 5 Lt. connection on a gas meter.  Finally, a gas meter nut has a specially threaded inside diameter.  For this reason, it does not, and cannot, connect to any length of pipe.  Neither can it connect to, or form any part of, any pipe fitting.  It can only be mated to a comparably threaded connection on a gas meter.

Thus, the evidence suggests that gas meter swivels and nuts differ from traditional pipe fittings because the flanged end of the swivel only mates and seals to a gas meter through the use of a meter nut.  Significantly, gas meter swivels and nuts never appear in a piping system without a gas meter.  In other words, swivels and nuts serve no purpose in a piping system except to allow a gas meter to be connected to the system.  This is in contrast to the fittings covered by the Order.  Whatever their form (for example, elbow, cross, or tee), the purpose of those fittings is to connect pipe (whether gas pipe or pipe for another service).  Their purpose is not to connect something else, such as a gas meter, into a piping system.[8]

---

[8]    We are cognizant of the government's argument that it is improper to consider the specialized use of meter swivels and meter nuts, as well as the fact that they are manufactured according to different specifications than other malleable iron pipe fittings.  The government urges that the plain language of the Order does not

Gas meter swivels are able to connect, at least on one side, with a pipe fitting.[9] In this sense, as Commerce found, they "indisputably" are fittings. However, Commerce next concluded that swivels are pipe fittings within the scope of the Order "because they are parts of a piping system, they direct the flow of the gas through a piping system, and can be, although are not always, connected to other pipe fittings or pipes." This, we think, is where Commerce erred. It is not enough that the swivels and nuts are "parts of a piping system." Rather, they must be the kind of fittings that are covered by the Order. However, as just discussed, in our view the evidence of record suggests that gas meter swivels, as well as gas meter nuts, differ from the pipe fittings that are covered by the Order. Under these circumstances, at the least, it cannot be said that the criteria set forth in 19 C.F.R. § 351.225(k)(1) are dispositive on the question of whether Sango's gas meter swivels and nuts are covered by the Order.

_____

(Cont'd. . . .)
specify any manufacturing standards, but, rather, only provides a description of the subject merchandise in general terms, as required by regulation. The answer to this argument is that the section 351.225(k)(1) evidence, which is used to determine the Order's scope, includes ANSI and ASME standards, see Antidumping Petition, at 4-5, and the use of pipe fittings, see United States International Trade Commission, Malleable Iron Pipe Fitting from China: Determination and Views of the Commission, Investigation No. 731-TA-1021 (Preliminary), at 5 (Dec. 2002). Thus, it is appropriate to consider the different specifications and uses for gas meter swivels and nuts.

[9] As discussed supra in note 3, the parties dispute whether a gas meter swivel can connect to pipe directly. We think that this factual dispute is something that could be resolved by looking at the "physical characteristics of the product" under the 19 C.F.R. § 351.225(k)(2) criteria.

In sum, while we are not prepared to hold that Sango is entitled to a ruling by Commerce that gas meter swivels and nuts are outside the scope of the Order, for the reasons set forth above, we do hold that substantial evidence does not support Commerce's conclusion that the criteria set forth at 19 C.F.R. § 351.225(k)(1) are dispositive as to whether gas meter swivels and nuts are within the scope of the Order. We thus hold that Commerce should have considered the criteria of 19 C.F.R. § 351.225(k)(2) to determine whether the swivels and nuts are pipe fittings within the scope of the Order. Accordingly, we reverse the decision of the Court of International Trade and remand the case to the court for a further remand to Commerce, so that Commerce may consider the criteria in section 351.225(k)(2) in arriving at a scope determination.[10]

## CONCLUSION

The final decision of the Court of International Trade is reversed. The case is remanded to the Court of International Trade for further proceedings consistent with this opinion.

## COSTS

Each party shall bear its own costs.

REVERSED and REMANDED

---

[10] Needless to say, we express no views as to what the results of that determination should be.