Note: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

---

**A.L. PATTERSON, INC.,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

AND

**VULCAN THREADED PRODUCTS, INC.,**
*Defendant-Appellee.*

---

2013-1526

---

Appeal from the United States Court of International Trade in No. 11-CV-0192, Senior Judge Richard W. Goldberg.

---

Decided: September 22, 2014

---

THOMAS M. BELINE, Cassidy Levy Kent (USA) LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was JAMES R. CANNON, JR.

CARRIE DUNSMORE, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department

of Justice, of Washington, DC, argued for defendant-appellee United States.  On the brief were STUART F. DELERY, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and PATRICIA M. MCCARTHY, Assistant Director.  Of counsel on the brief was DANIEL J. CALHOUN, Attorney, Office of Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, of Washington, DC.  Of counsel was MELISSA M. DEVINE, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC.

FREDERICK P. WAITE, Vorys, Sater, Seymour and Pease LLP, of Washington, DC, argued for defendant-appellee Vulcan Threaded Products, Inc.  With him on the brief was KIMBERLY R. YOUNG.

---

Before PROST, *Chief Judge,* MOORE and CHEN, *Circuit Judges.*

PROST, *Chief Judge.*

A.L. Patterson, Inc. ("Patterson") appeals from the decision of the United States Court of International Trade entering judgment affirming the final determination of the United States Department of Commerce ("Commerce") that Patterson's steel coil rod falls within the scope of the anti-dumping order originally published in Certain Steel Threaded Rod from the People's Republic of China: Notice of Antidumping Order, 74 Fed. Reg. 17,154, 17,155 (April 14, 1999) ("order").  Because Commerce's determination was not supported by substantial evidence, we reverse.

I

In 2008, Vulcan Threaded Products, Inc. ("Vulcan") filed a petition alleging the dumping of "certain steel threaded rods" from the People's Republic of China. Commerce initiated an investigation by the International

Trade Commission ("the Commission"). Following the Commission's determination that there was material injury to the domestic industry, and Commerce's determination that Chinese imports were sold at less than fair value, Commerce published an antidumping duty order directed towards certain steel threaded rods. Commerce provided the following scope of the order:

> The merchandise covered by this order is steel threaded rod. Steel threaded rod is certain threaded rod, bar, or studs, of carbon quality steel, having a solid, circular cross section, of any diameter, in any straight length, that have been forged, turned, cold-drawn, cold-rolled, machine straightened, or otherwise cold-finished, and into which threaded grooves have been applied. In addition, the steel threaded rod, bar, or studs subject to this order are non-headed and threaded along greater than 25 percent of their total length. A variety of finishes or coatings, such as plain oil finish as a temporary rust protectant, zinc coating (i.e., galvanized, whether by electroplating or hot-dipping), paint, and other similar finishes and coatings, may be applied to the merchandise.
>
> Included in the scope of this order are steel threaded rod, bar, or studs, in which: (1) iron predominates, by weight, over each of the other contained elements; (2) the carbon content is 2 percent or less, by weight; and (3) none of the elements listed below exceeds the quantity, by weight, respectively indicated:
>     . . . [1]

---

[1] For brevity, we omit the list of maximum quantities by weight of each of the elements set forth in the order.

> Steel threaded rod is currently classifiable under subheading 7318.15.5050, 7318.15.5090, and 7318.15.2095 of the United States Harmonized Tariff Schedule ("HTSUS"). Although the HTSUS subheading is provided for convenience and customs purposes, the written description of the merchandise is dispositive.
>
> Excluded from the scope of the order are: (a) threaded rod, bar, or studs which are threaded only on one or both ends and the threading covers 25 percent or less of the total length; and (b) threaded rod, bar, or studs made to American Society for Testing and Materials ("ASTM") A193 Grade B7, ASTM A193 Grade B7M, ASTM A193 Grade B16, or ASTM A320 Grade L7.

Order, 74 Fed. Reg. at 17,155. The order was later modified to include an express reference to HTSUS subheading 7318.15.5051, "Continuously threaded rod: of alloy steel." 76 Fed. Reg. 68,400, 68,402 (Nov. 4, 2011).

Patterson imports engineered steel coil rod ("coil rod") from the People's Republic of China. At the time the order was published, Patterson imported coil rod under HTSUS subheading 7316.00.0000, "Anchors, grapnels, and parts thereof, of iron or steel." In January 2011, U.S. Customs and Border Patrol ("Customs") issued a Notice of Action to Patterson informing it that its coil rod should be classified under subheading 7318.15.501. Patterson was also notified that henceforth it would be subject to anti-dumping duty pursuant to the order.

In response, Patterson submitted an application for a scope determination to Commerce. Patterson argued that coil rod was not within the definition of "certain steel threaded rod" pursuant to the order, and that it is in fact within an industry different from that which the Commission investigated in its material injury inquiry. Patterson

pointed to the description provided by Commerce that certain steel threaded rod

> is primarily used in commercial construction to suspend electrical conduits, plumbing pipes, HVAC ductwork, and fire protection sprinkler pipes. It is also used to hang suspended ceilings and elevated conveyor belts, in joint restraint systems for underground piping, in structural tie downs in earthquake and hurricane-resistant systems for roofing, as headless screws, for bolting together pipe joints in waterworks applications, and for basic industrial repair.

Certain Steel Threaded Rod from China, Inv. No. 731-TA-1145, USITC Pub. 4070, at 5 (Apr. 2009) ("Final Determination"). Patterson argued that, by contrast, the coil rod it imported was distinctly used with steel anchors for the rapid assembly and disassembly of molds that form large precast concrete sections, as well as in raising and lowering heavy concrete sections. Patterson's Br. 4-5. Vulcan's petition had not expressly mentioned "coil rod," and Patterson argued that coil rod was not part of either Commerce's or the Commission's investigations. In particular, Patterson raised the fact that none of three U.S. producers of coil rod were identified in Vulcan's petition or part of the underlying investigations.

On May 24, 2011, Commerce issued its final scope ruling, determining that Patterson's coil rod was within the scope of the antidumping order. In its ruling, Commerce explained that "although Patterson argues that coil rod was not considered in the petition, investigation, or [the Commission] proceedings, the Department does not find that this factor outweighs the scope language, which indicates that coil rod was within the scope of the [order]." J.A. 407. Patterson challenged Commerce's determination to the Court of International Trade. The court granted Patterson's motion for judgment on the agency record

and remanded to Commerce for redetermination. *A.L. Patterson, Inc. v. United States*, No. 11-00192, 2012 WL 3538722 (Ct. Int'l Trade Aug. 6, 2012) ("*Patterson I*").

The Court of International Trade's decision was based on three grounds. First, it held that Commerce's finding that the scope language unambiguously included Patterson's product was, on its own, insufficient to support the scope determination by substantial evidence. Second, the court noted that it was well established that prior to the imposition of an antidumping duty, (1) the Commission must make a domestic injury determination and (2) Commerce must make a determination of sales at less than fair value prior to imposition of antidumping duty, pursuant to the governing statute, 19 U.S.C. § 1673. The court thus ordered Commerce to consider on remand the evidence proffered by Patterson that its coil rods were not included in the underlying investigations. Third, the court held that because Commerce did not address any of Patterson's argument and relied only on the language of the order, it had not adequately explained the reasons for its final scope determination.

In December 2012, Commerce informed Patterson of the final results of redetermination, wherein Commerce again determined that the coil rod fell within the scope of the order. Commerce provided a lengthier and more detailed analysis of the physical specifications described in the order, and it again determined that Patterson's product met those requirements. Commerce also determined that there was no basis to conclude that the Commission excluded coil rod from its investigation. J.A. 1159. It found that the petition did identify Chinese producers of coil rod, based on printouts of websites advertising their coil rod for sale that Vulcan submitted in its rebuttal comments. *See* J.A. 369-76. Commerce also found that the petition and subsequent investigations were intended to include coil rod producers because the original petitioner, Vulcan, provided an affidavit in 2011

affirming that "Petitioner had produced coil rod in the past and still had the capability to do so." J.A. 1158. Commerce concluded that while "coil rod" did not appear in any of the production or sales reports included in the investigation, it "does not consider that the absence of a product with a particular combination of characteristics" from those reports "creates an exclusion of that product" from the scope of the resultant antidumping order. J.A. 1161. Commerce thus determined that Patterson's coil rod is within the scope of the order.

Patterson challenged Commerce's remand redetermination. The Court of International Trade issued a one-page order summarily sustaining Commerce's determination and entering judgment for the United States. *A.L. Patterson, Inc. v. United States*, No. 11-00192 (Ct. Int'l Trade May 22, 2013) ("*Patterson II*"). Patterson appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## II

We review the Court of International Trade's decisions concerning Commerce's scope determinations de novo, "stepping into its shoes and applying the same standard of review." *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011). We thus hold unlawful any determination found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i).

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). "This is something less than the weight of evidence," so we may find that Commerce's determination is supported by substantial evidence even if it is possible to draw "two inconsistent conclusions from the evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). While respecting agency expertise, the Supreme Court "has

stressed the importance of not simply rubber-stamping agency fact-finding." *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999). Our review "requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion." *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1363 (Fed. Cir. 2006); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477-78 (1951). On the question at issue in this case, we have held that while Commerce "enjoys substantial freedom to interpret and clarify its antidumping duty orders . . . it may not change them." *Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995).

### III

While there is no statute that governs the determination of whether a product is within the scope of an antidumping order, an interested party may ask Commerce to make such a determination, as Patterson did, pursuant to 19 C.F.R. § 351.225(c). With respect to such a scope determination, the regulation requires Commerce to take into account "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1). When these criteria are "not dispositive," Commerce considers other evidence related to the factors described in 19 C.F.R. § 351.225(k)(2).

The Tariff Act "provides a two-step process to address harm to domestic manufacturing from foreign goods sold at an unfair price." *United States v. Eurodif S.A.*, 555 U.S. 305, 310-11 (2009). Commerce "determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value," and the Commission determines that there is an industry in the United States that is materially injured, threatened by material injury, or whose establishment is mate-

rially retarded because of imports of that merchandise. 19 U.S.C. § 1673. Antidumping duties may only be imposed pursuant to these investigations. The term "industry" in § 1673 means "the producers as a whole of a domestic like product" where "domestic like product" is defined as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle." 19 U.S.C. § 1677(a)(4), (10). The determination of what goods constitute "domestic like products" defines the "scope of a domestic industry and, in turn, the scope of the Commission's material injury analysis." *Cleo Inc. v. United States*, 501 F.3d 1291, 1295 (Fed. Cir. 2007) (citing *Allegheny v. Ludlum Corp. v. United States*, 287 F.3d 1365, 1368 (Fed. Cir. 2002)). To determine whether coil rod is within the scope of the antidumping duty order in this case, Commerce must examine the § 351.225(k)(1) criteria.

Of course, while "review of the petition and the investigation may provide valuable guidance as to the interpretation of the final order . . . they cannot substitute for language in the order itself." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002). This is because the final order indicates what the agency ultimately determined should be the scope of the order. *Id.* In *Duferco*, we noted that, at that time, the Court of International Trade's interpretive process had "it exactly backwards"—relying on the petition, investigations, and initial order, rather than the agency's final order to interpret scope. *Id.* at 1096. We held, instead, that "a predicate for the interpretive process is language in the order that is subject to interpretation." *Id.* at 1097. Imposing this rule in *Duferco* prevented Commerce from using the interpretive process to "impermissibly modif[y] the orders to include products that were not within the scope of the original . . . orders." *Id.* at 1098; *see also Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1383 (Fed. Cir. 2005)

("The scope of the order can be clarified but it cannot be changed by the interpretive process.").

Commerce argues that if Patterson's coil rod falls within the plain language of the order's scope, then the § 351.225(k)(1) criteria need not be considered.[2]  Commerce's argument cannot be reconciled with the plain language of the regulation which explicitly states that Commerce, in rendering a scope ruling, "will take into account" "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission." § 351.225(k)(1).

*Duferco*'s holding does not mean that the mere literal terms of the order trump any possibility of interpretation. In *Duferco*, Commerce had determined that a product was included within the scope of the order even though it did *not* meet the plain language.  296 F.3d at 1095.  We reversed the Court of International Trade because looking to the petition and investigations cannot be grounds for *expanding* the scope beyond what Commerce had concluded when it issued the final order.  *Id.* at 1098.

Even when merchandise *is* facially covered by the literal language of the order, it may still be outside the scope if "the order can *reasonably be interpreted* so as to exclude it."  *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1301 (Fed. Cir. 2013) (emphasis added).[3]

---

[2]  Though, as ordered by the Court of International Trade, Commerce eventually did make findings on the § 351.225(k)(1) criteria, it did so under "protest."  J.A. 1152.  *See also* Commerce's Br. 31-33.  Vulcan also raises this argument on appeal.

[3]  In *Mid Continent Nail*, we held that where the parties did not dispute that a product is within the literal scope of the order, there may be a "presumption" that the

This principle applies even though we recognize that antidumping orders are often broadly drawn, since "descriptions of the subject merchandise must be written in general terms." *Novosteel SA v. United States*, 284 F.3d 1261, 1269-70 (Fed. Cir. 2002) (quoting 19 C.F.R. § 51.225(a)). Nevertheless, Commerce must still assess the § 351.225(k)(1) criteria, which by plain language of the regulation extends the inquiry beyond the description of the product in the antidumping order.

Accordingly, the question of whether Patterson's coil rod meets the order's physical specifications only begins the inquiry. Patterson at least presented a reasonable basis for interpreting the order to exclude coil rod in light of the § 351.225(k)(1) criteria. For example, Patterson presented evidence showing that coil rod is a distinct domestic market that the Commission did not investigate. Therefore, Commerce had to make findings, supported by substantial evidence, on whether coil rod was the kind of steel threaded rod sold in the domestic industry that the Commission investigated and found injury.

IV

While we agree that Commerce needed to consider the § 351.225(k)(1) in its findings, as the Court of International Trade indicated in its decision to remand in *Patterson I*, we disagree with the court's summary affirmance of

---

sale of that product as a mixed media item falls within the scope as well. 725 F.3d at 1304. We note that here, while Commerce cites *Mid Continent Nail* to support its position, by contrast, though Patterson concedes that its coil rod meets the physical description in the order, it nonetheless does in fact dispute whether its coil rod is the "steel threaded rod" to which the order literally refers. *Cf. Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1073-74 (Fed. Cir. 2001).

Commerce's redetermination in *Patterson II*. Commerce's analysis on remand continued to be effectively limited to the physical description of merchandise to the exclusion of the remaining § 351.225(k)(1) criteria.[4] First, Commerce found that the petition intended to include Patterson's coil rod since it met the specified dimensions and material composition therein. Second, Commerce found that the investigations tracked the physical description language of the petition. J.A. 1158. For the aforementioned reasons, this evidence is not dispositive on its own. The scope determination must be supported by substantial evidence, considering the § 351.225(k)(1) criteria, in view of the record as a whole—including evidence that coil rod was excluded from Commerce's and the Commission's investigations.

As an initial matter, Patterson contends that its coil rod is physically distinguishable from the steel threaded rod that was the focus of Vulcan's petition. Patterson argues that the coils in its coil rod are larger and spaced

---

[4]    Commerce noted in its redetermination that to the extent Patterson objected to the breadth of the physical description provided in its order, it should have done so during the investigation and sought an exclusion for its coil rod. As an initial matter, the scope determination procedure is provided for in regulations to any party that seeks to clarify the scope of an order as it relates to its merchandise—there is no affirmative obligation on that party to challenge an order before it is published. In any event, in this case Patterson had no reason to believe that it was within the scope of the order, as no coil rod producers or importers were named in the petition nor included in the investigation. Indeed, Patterson was not informed by Commerce that it was subject to the order until January 2011 when Customs reclassified its products, nearly two years after the order was originally published.

farther apart than those of threaded rods, that coil rod is made of an alloy with a higher carbon content, and that it is shaped for its intended use of lifting and handling concrete. By contrast, in its petition, Vulcan indicated that the uses of threaded rod were "to suspend electrical conduit, pipes for plumbing, HVAC ductwork, and sprinkler pipes for fire protection," as well as related structural applications. J.A. 93. The petition neither mentions coil rod nor any of the uses of coil rod. Vulcan named no domestic producers of coil rod in its description of the domestic threaded rod industry. Commerce did conclude, retrospectively, that Vulcan intended to include coil rod on the basis of an affidavit it provided in 2011, in which it averred that it had produced coil rod at some time in the past and had the capacity to do so again. J.A. 1158. However, there is no evidence that, *at the time* Vulcan filed the petition, it made coil rod, intended to make coil rod, or had decided not to make coil rod because of competition from imports.

There is no evidence that the threaded rod that was the focus of the petition was interchangeable with coil rod in its use as a concrete accessory or that the threaded rod and coil rod markets overlapped. For example, as the record demonstrates, these products are distributed through distinct channels. Steel threaded rod is sold to "electrical, general, HVAC, mechanical, plumbing and/or other contractors or consumers," whereas coil rod is sold in marketing materials such as "Precast Concrete Products" and "Precast Lifting, Anchoring & Handling." Steel threaded rod is sold for one-time use, whereas coil rod is sold for repetitive use. Moreover, coil rod is sold at over four times the cost, per pound, of steel threaded rod. In short, the record in this case does not support a finding that coil rod was ever considered part of the investigation. And given the evidence that coil rod is a distinctly different product in a different domestic industry than the steel

threaded rod that was investigated, Commerce's scope determination was not supported by substantial evidence.

First, Commerce argues that Chinese producers of coil rod for import to the United States were named in the petition. Of the thirteen producers named in the petition, however, the record before Commerce only showed four which also sold coil rod in addition to their steel threaded rod. This was, moreover, based on websites presented by Vulcan in its March 2011 rebuttal to Patterson's scope request. Even if we were to credit non-contemporaneous evidence regarding the Chinese importers, these four did not even respond to Commerce's questionnaires during its investigation of less than fair value sales. *See* J.A. 579-80. There is, therefore, no evidence that coil rod sales were included at all. To the extent the materials considered in the § 351.225(k)(1) criteria analysis mention "coil rod" or "coiled rod," that product is referred to as a product separate from steel threaded rod. There were, according to the (k)(1) materials, a few questionnaire respondents who indicated that they make a product other than the certain steel threaded rod subject to the investigation on the same machine—coiled rod. The parties suggest that there is confusion as to the meaning intended in these references to "coil rod" and "coiled rod." The (k)(1) materials can afford only two possibilities: either Patterson's coil rod was not included in the investigation or it was considered by respondents to be a different product than the steel threaded rods being investigated and was therefore not within the scope of the investigation.

Second, there is no evidence to rebut Patterson's evidence that domestic producers of coil rod were entirely excluded from the Commission's investigation and that no evidence of sales of coil rod were included by any respondents. Commerce and Vulcan argue that coil rod can be made on the same production line as certain steel threaded rod. However, even if true, this is not evidence that

any domestic producers were injured, or declined to produce, due to imports of coil rod from the PRC. Indeed the Commission's final report includes no discussion of either coil rod or any kind of concrete accessories rods. Of course, the Commission does not need to investigate every possible variant of a product—but that assumes the variants are all being sold within the same domestic industry which is under investigation. In this case, however, the record shows that coil rod is directed to a distinct and different domestic industry, which the Commission did not investigate.

The record before us shows that the investigations that supported the antidumping order was not on Patterson's coil rod but rather other kinds of steel threaded rods. *Cf. Sango Int'l, L.P. v. United States*, 484 F.3d 1371, 1380-81 (Fed. Cir. 2007). Commerce came forward with no evidence to support the conclusion that coil rod is in the domestic industry investigated by the Commission. In sum, there is insufficient evidence to conclude that Patterson's coil rod, a distinctly different product than steel threaded rod, was part of the Commission's material injury investigation. As such, Commerce may not impose antidumping duties on coil rod under § 1673. *See Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1371 (Fed. Cir. 1998).

V

Accordingly, we reverse the Court of International Trade's judgment that Commerce's scope determination was supported by substantial evidence; and, therefore, Patterson's coil rod is not subject to the antidumping order.

**REVERSED**