# United States Court of Appeals for the Federal Circuit

---

**ARCELORMITTAL STAINLESS BELGIUM N.V.**
(now known as Aperam Stainless Belgium N.V.),
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee,*

AND

**ALLEGHENY LUDLUM CORPORATION,**
*Defendant-Appellee.*

---

2011-1578

---

Appeal from the United States Court of International Trade in case no. 08-CV-0434, Judge Richard K. Eaton.

---

Decided: September 7, 2012

---

BRYAN H. DAYTON, Shearman & Sterling, LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was ROBERT S. LARUSSA.

PATRICIA M. MCCARTHY, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for

defendant-appellee, United States.  With her on the brief were TONY WEST, Assistant Attorney General, and JEANNE E. DAVIDSON, Director.  Of counsel on the brief was DANIEL J. CALHOUN, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

JEFFREY S. BECKINGTON, Kelley Drye & Warren, LLP, of Washington, DC, argued for defendant-appellee, Allegheny Ludlum Corporation.  With him on the brief was DAVID A. HARTQUIST.

---

Before RADER, *Chief Judge*, PLAGER, and LINN, *Circuit Judges*.

PLAGER, *Circuit Judge*.

This is an antidumping case.  It involves the scope of the Department of Commerce's ("Commerce") antidumping duty order on certain stainless steel plate in coils ("SSPC").  The order states that the products subject to the order are those which are "4.75 mm or more in thickness."  Aperam Stainless Belgium N.V. ("ASB"),[1] a Belgian producer of SSPC, requested a scope ruling to determine whether its products, which have nominal thicknesses of 4.75 mm or more but are imported into the United States with actual thicknesses less than 4.75 mm, are included within the scope of the order.

Commerce determined that the scope of its antidumping order encompasses SSPC having a *nominal* thickness of 4.75 mm but an *actual* thickness of less than 4.75 mm

---

[1]    Aperam Stainless Belgium N.V. was formerly known as "ArcelorMittal Stainless Belgium N.V.," which was formerly known as "Ugine & ALZ Belgium N.V."  In this opinion, we refer to all three entities as ASB.

and, therefore, the order applies to ASB's products. ASB appealed Commerce's scope ruling to the Court of International Trade, which agreed with Commerce and affirmed.[2] Because Commerce's final scope ruling is not supportable since it is contrary to the plain language of the order, we reverse.

BACKGROUND

I.

This appeal stems from an antidumping order concerning certain stainless steel plate in coils. "Dumping" is the sale of foreign merchandise in the United States at less than fair value, *i.e.*, less than the price at which the merchandise is sold in the foreign producer's home market. 19 U.S.C. § 1673. To curtail such dumping activity, Commerce is authorized to issue antidumping orders imposing duties on imported merchandise. *Id.*

A domestic industry concerned about possible dumping activity may initiate an investigation by filing a petition with Commerce. 19 U.S.C. § 1673a(b).[3] If the petition satisfies the statutory requirements, Commerce will commence an antidumping investigation. *Id.* § 1673a(c). Commerce then collects information from foreign producers and makes a preliminary determination as to the existence and extent of dumping and the amount of duties that should be imposed. *Id.* § 1673b(b), (d). Meanwhile, the International Trade Commission collects information from the affected domestic industry and

---

[2] *ArcelorMittal Stainless Belgium N.V. v. United States*, No. 08-00434, 2011 WL 2713872 (Ct. Int'l Trade July 12, 2011).

[3] Commerce can also initiate the process itself. 19 U.S.C. § 1673a(a).

makes a preliminary determination as to whether a threat of material injury exists. *Id.* § 1673b(a).

After further proceedings, if Commerce makes a final determination that dumping has occurred, and if the International Trade Commission makes a final determination of material injury, Commerce issues a final antidumping order that defines which goods are subject to antidumping duties and their duty rate. 19 U.S.C. §§ 1673d, 1673e. Upon request, the administering agencies will periodically review the existence and extent of dumping, the amount of the duty, and the question of material injury. *Id.* § 1675.

After the issuance of a final antidumping order, questions may arise regarding its scope. Commerce's regulations provide for a procedure called a scope ruling to determine whether a particular product is included within the scope of an antidumping order. 19 C.F.R. § 351.225. In a scope ruling proceeding "a predicate for the interpretive process is language in the order that is subject to interpretation." *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1383 (Fed. Cir. 2005) (citing *Duferco Steel Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002)). If Commerce determines that the language at issue is not ambiguous, it states what it understands to be the plain meaning of the language, and the proceedings terminate. On the other hand, if Commerce finds that the scope language is ambiguous, it then looks to two sets of factors spelled out in its regulations to determine the intended scope of the order.[4] This appeal stems from such a scope ruling proceeding.

---

[4] *See* 19 C.F.R. § 351.225(k)(1), which requires Commerce to examine the history of the proceedings, and 19 C.F.R. § 351.225(k)(2), which specifies factors including (i) the physical characteristics of the product; (ii) the

## II.

On March 31, 1998, Allegheny Ludlum Corporation ("Allegheny"), along with other members of the domestic stainless steel industry, petitioned Commerce to impose antidumping and countervailing duties on SSPC from several countries, including Belgium.[5] SSPC is used in the fabrication of large storage tanks, process vessels, and other types of industrial equipment requiring corrosion resistance. The petition identified the foreign merchandise at issue based on the Harmonized Tariff Schedule's definition of stainless steel as "alloy steels containing, by weight, 1.2 percent or less of carbon and 10.5 percent or more of chromium." The petition employed the American Iron and Steel Institute's definition of plate as "a flat-rolled or forged product that is 10 inches and over in width and 0.1875 inches and over in thickness." In response to Commerce's inquiries regarding the scope of the petitions, petitioners provided metric equivalents for the width and thickness dimensions of 254 mm and 4.75 mm, respectively. The petitioners noted that although "the precise metric equivalent of the 0.1875 inch minimum thickness for plate products is 4.76 mm, . . . [p]etitioners believe that the general practice in the industry is to refer to plate that is 0.1875 inch thick as also 4.75 mm thick." Finding the petition satisfactory, Commerce initiated an antidumping duty investigation, and defined the scope of

---

expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed.

[5]  The other petitioners were: AK Steel Corp.; North American Stainless; and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union. The other countries were: Canada, Italy, South Korea, South Africa, and Taiwan.

the investigation using the metric dimensions provided by petitioners, including the 4.75 mm thickness dimension. *Initiation of Antidumping Duty Investigations: Stainless Steel Plate in Coils from Belgium, Canada, Italy, Republic of South Africa, South Korea and Taiwan*, 63 Fed. Reg. 20,580 (Apr. 27, 1998).

Although the SSPC industry recognizes two types of thickness measurements, nominal thickness and actual thickness, Commerce, when it stated the 4.75 mm dimension in its definition of the scope of the investigation, and later when it issued orders based on that investigation, did not specify or otherwise differentiate between nominal and actual thickness. "Nominal thickness" is the measurement purchasers use when ordering SSPC, and "actual thickness" is the measured thickness of the delivered product. Because the manufacturing process is not perfect, the industry has established "tolerance ranges" within which certain actual thicknesses are considered equivalent to the nominal thickness that was ordered. In other words, the actual delivered thickness may vary from, by being slightly under or over, the ordered or nominal thickness, and still meet the specifications of the contract order.

In May of 1998, Commerce solicited information from ASB and the other foreign producers, instructing them to "[r]eport actual thicknesses; if nominal thicknesses are used in your normal course of business, convert these to actual thicknesses." Four months later, however, Commerce changed its instructions and requested the foreign producers to "ensure that all sales of products for which the nominal thickness is greater than or equal to 4.75 mm have been included in your . . . questionnaire response."

Based on the information collected during the investigation, Commerce determined that sales of foreign mer-

chandise were being made at dumped prices, and the International Trade Commission determined that the dumped imports were a cause of injury to domestic producers. Accordingly, Commerce imposed antidumping and countervailing duty orders on the subject SSPC. *Antidumping Duty Orders; Certain Stainless Steel Plate in Coils from Belgium, Canada, Italy, the Republic of Korea, South Africa, and Taiwan*, 64 Fed. Reg. 27,756 (May 21, 1999). The current scope of the orders recites:

> The product covered by these orders is certain stainless steel plate in coils. Stainless steel is an alloy steel containing, by weight, 1.2 percent or less of carbon and 10.5 percent or more of chromium, with our without other elements. The subject plate products are flat-rolled products, 254 mm or over in width and **4.75 mm or more in thickness**, in coils, and annealed or otherwise heat treated and pickled or otherwise descaled. The subject plate may also be further processed (e.g., cold-rolled, polished, etc.) provided that it maintains the specified dimensions of plate following such processing. Excluded form the scope of this order are the following: (1) Plate not in coils, (2) plate that is not annealed or otherwise heat treated and pickled or otherwise descaled, (3) sheet and strip, and (4) flat bars.

> The merchandise subject to this review is currently classifiable in the Harmonized Tariff Schedule of the United States (HTS) at [specified] subheadings . . . . Although the HTS subheadings are provided for convenience and Customs purposes, the written description of the merchandise subject to these orders is dispositive.

*Notice of Amended Antidumping Duty Orders; Certain Stainless Steel Plate in Coils from Belgium, Canada, Italy, the Republic of Korea, South Africa, and Taiwan*, 68 Fed. Reg. 11,520 (Mar. 11, 2003) (emphasis added).

Over the next five years, ASB participated in three administrative reviews of the antidumping duty order.[6] In the reviews, Commerce reiterated its request that ASB "include in your response all sales of products for which the nominal thickness is greater than or equal to 4.75 mm." In the 2000-2001 administrative review Commerce examined invoices for ASB's products having a nominal thickness greater than or equal to 4.75 mm but an *actual* thickness of less than 4.75 mm, and concluded that such merchandise "was not subject to this review." In keeping with that decision, Commerce permitted ASB to exclude certain nominal thickness SSPC sales during the 2002-2003 administrative review.

ASB again excluded similar nominal thickness SSPC sales during the 2003-2004 administrative review, but this time Commerce concluded that such data should have been reported because "the scope of this Order includes nominal SSPC." Commerce advised ASB that if it "believed that the scope of this Order should have been amended to exclude nominal SSPC, it should have requested a scope inquiry on the issue under section 351.225 of the Department's Regulations."

ASB subsequently petitioned Commerce in May of 2007 for a ruling regarding whether the scope of the order on SSPC from Belgium excludes stainless steel products with an actual thickness less than 4.75 mm, regardless of its nominal thickness. Commerce "analyzed the product in question pursuant to the criteria established in 19 CFR

---

[6] ASB withdrew during the first administrative review, and no party requested review for the third period.

351.225(k)(1) and (2)" and concluded that "the product[s] subject to the scope-ruling request . . . are 254mm (10 inches) or more in width and 4.75mm (0.1875 inches) or more in thickness . . . within the dimensional tolerances indicated in the ASTM [Standard], even if actual thickness is less than 4.75mm . . . ."[7]

ASB appealed Commerce's decision to the Court of International Trade. On appeal, Commerce conceded "that it failed to provide an analysis of the language of the Orders (*i.e.*, in order to determine, in the first instance, whether or not the language in the Orders is ambiguous)" and requested a voluntary remand. The Court of International Trade agreed, and in a March 30, 2010 order, remanded the matter to Commerce to further develop the agency record in a manner consistent with our decisions in *Duferco* and *Tak Fat*.

On remand, Commerce determined that the language of the order was ambiguous in view of what it understood to be the industry practice of using nominal measurements in purchases and sales of SSPC, and that the factors listed in 19 C.F.R § 351.225(k)(1) of its regulations did not clarify the ambiguity. Commerce then incorporated its earlier analysis under 19 C.F.R. § 351.225(k)(2) and reiterated its conclusion that the scope of the order includes merchandise with a nominal thickness of 4.75 mm regardless of the actual thickness. ASB appealed to the Court of International Trade, and that court affirmed Commerce's ruling. This appeal followed. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

---

[7] The ASTM Standard was established by ASTM International, formerly known as the American Society for Testing and Materials, which develops and delivers international voluntary consensus standards. *See* ASTM International, "ASTM Overview," *available at* http://www.astm.org/.

DISCUSSION

I.

We review decisions of the Court of International Trade evaluating Commerce's antidumping determinations by reapplying the standard that the Court of International Trade applied in reviewing the administrative record. *Tak Fat*, 396 F.3d at 1382. Accordingly, we will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

II.

As explained, the first step in a scope ruling proceeding is to determine whether the governing language is in fact ambiguous, and thus requires analysis of the regulatory factors previously outlined. If it is not ambiguous, the plain meaning of the language governs. The Court of International Trade held that "where, as here, the relevant industry generally defines product thickness in nominal terms, it is reasonable for Commerce to conclude that the Department's failure to specify whether '4.75 mm in thickness' was a nominal or actual measurement rendered the Orders ambiguous." *ArcelorMittal*, 2011 WL 2713872, at *13.

ASB challenges the Court of International Trade's determination that substantial evidence supported Commerce's conclusion that the language of the SSPC antidumping orders are ambiguous. ASB argues that the plain language of the order is not ambiguous because a number, unless otherwise modified, means the actual number. Thus, ASB argues, Commerce should not have considered industry custom in making its threshold determination of ambiguity because the order's plain language is dispositive.

In response, the Government and Allegheny defend the Court of International Trade's holding of ambiguity, arguing that Commerce reasonably turned to industry custom in analyzing the scope of the order. The Government and Allegheny contended, and the Court of International Trade found, that although the phrase "4.75 mm or more in thickness" might refer to an actual measurement in everyday parlance, antidumping orders should be interpreted in the context of the industry in which the regulated merchandise is manufactured, bought, and sold.

Both arguments have some merit. The absence of one thing does not prove the opposite—as we have said, "Commerce cannot find authority in an order based on the theory that the order does not deny authority." *Duferco*, 296 F.3d at 1096. Similarly, Commerce may not find a measurement in an order ambiguous merely because the value is not modified by the terms "actual" or "nominal." Rather, as the Court of International Trade observed during oral argument, "[i]t seems to me that not having actual or nominal leans toward actual." Transcript of Oral Argument at 21, *AcelorMittal*, 2011 WL 2713872 (No. 08-00434). Thus, Commerce logically could treat unmodified dimensions in antidumping duty orders as actual measurements, and conclude that there is no ambiguity.

On the other hand, we agree with the Government and Allegheny that antidumping orders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry. As the Court of International Trade also observed, "[c]ourts have long recognized the importance of considering context, including industry custom, in interpreting written language." *ArcelorMittal*, 2011 WL 2713872, at *9 n.8. Because the primary purpose of an antidumping order is to place foreign exporters on notice

of what merchandise is subject to duties, the terms of an order should be consistent, to the extent possible, with trade usage. Thus, a finding of no ambiguity for unmodified numbers may be rebutted by sufficient evidence showing that actual measurements are not customarily used in the relevant industry.[8]

As earlier explained, the SSPC industry uses both nominal and actual values; nominal measurements reflect what was ordered, while actual measurements reflect what was delivered. Commerce concluded that the industry's practice of using nominal thicknesses when ordering SSPC rendered the scope of the antidumping duty order ambiguous. *ArcelorMittal*, 2011 WL 2713872, at *3. But antidumping duty orders apply to goods as imported, not as they may have been ordered. Thus, the proper context in which to interpret the scope of the antidumping duty order is the industry practice regarding *delivered* products.

Furthermore, it turns out that Commerce had previously interpreted the very language in question. In *Notice of Final Determination of Sales Less than Fair Value: Certain Cut-to-Length Carbon Steel Plate from South Africa*, 62 Fed. Reg. 61,731 (Nov. 19, 1997) ("*Carbon Steel Plate*"), Commerce had determined "that '4.75 mm in thickness' was an actual measurement that excluded merchandise with an actual thickness of less than

---

[8]   However, consideration of industry jargon is not the same as conducting a full-fledged analysis of the factors embodied in 19 C.F.R. § 351.225(k)(2). In answering the initial question of whether a measurement recited in an antidumping duty order is subject to interpretation, the question Commerce asks is whether the measurement has an industry-accepted meaning that weighs against presumptively treating it as an actual measurement.

4.75 mm from its scope." *See ArcelorMittal*, 2011 WL 2713872, at *11.

*Carbon Steel Plate* involved an investigation of certain cut-to-length carbon steel plate from South Africa. The scope of the investigation included "certain iron and non-alloy steel flat-rolled products not in coils . . . 4.75 mm or more in thickness . . . ." 62 Fed. Reg. at 61,731. The petitioners in *Carbon Steel Plate* requested that Commerce clarify the scope of the investigation to include products "sold as having a $3/16"$ nominal thickness but 'rolled light' to an actual thickness of just under 4.75 mm (the boundary of the tariff classifications set forth in the scope description of the preliminary determination) ('light-rolled $3/16"$ plate')." *Id.* at 61,740, cmt.13. According to the petitioners, "any customer ordering a $3/16"$ . . . plate . . . would be willing to accept any thickness within the tolerance for that size plate. Thus, any plate within the tolerance for 4.75mm nominal thickness plate will compete directly with any other plate within the tolerance." *Id.*

Commerce, however, rejected petitioners' request, *id.* at 61,741, "given the clarity of the original scope," Memorandum on Scope of Investigations on Carbon Steel Plate, Joseph Spetrini to Robert S. LaRussa, 3 (Oct. 24, 1997) ("Carbon Plate Memorandum"). Thus, five months before initiating the SSPC investigation in this case, Commerce had already decided that the phrase "4.75 mm or more in thickness" reflects an actual measured thickness.

The Court of International Trade distinguished *Carbon Steel Plate* on the grounds that it "resolved a different issue based on a different administrative record." *ArcelorMittal*, 2011 WL 2713872, at *11. According to the Court of International Trade:

> Carbon Steel Plate did not squarely address the question before the court in this case. That is, no argument was made that the scope language was ambiguous because of the absence of the words "actual" or "nominal." Indeed, Carbon Steel Plate did not involve a dispute over the meaning of the scope language in the order at issue at all. To the contrary, that determination involved the petitioners' request to amend the scope of the order.

*Id.* But this is a distinction without a difference. Neither the procedural posture of *Carbon Steel Plate* nor the particular question Commerce was asked to address in that case changes the fact that in reaching its decision, Commerce recognized that the phrase "4.75 mm or more in thickness" unambiguously refers to an actual measurement. It belies common sense for Commerce to now conclude that the exact same phrase in the SSPC orders at issue in this case is ambiguous.

It is true that we have said elsewhere that only a "low threshold [is] needed to show that Commerce here justifiably found an ambiguity . . . ." *Novosteel SA v. United States*, 284 F.3d 1261, 1272 (Fed. Cir. 2002). However, as the Court of International Trade itself noted, "it is not justifiable to identify an ambiguity where none exists." *ArcelorMittal*, 2011 WL 2713872, at *9 (quoting *Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172, 1184 (Ct. Int'l Trade 2004)). Here, Commerce's broad reading of the SSPC order is in conflict with the plain language of the order itself, which unambiguously precludes nominal merchandise meeting the specified dimension when read in light of industry practice regarding delivered products and Commerce's previous decision in *Carbon Steel Plate*. Thus, Commerce was not justified in finding the order ambiguous.

III.

Finally, we take note of Commerce's apparently shifting views regarding the scope of the antidumping duty order at issue in this case. Over the course of five years, Commerce repeatedly reassured ASB that nominal merchandise as such was excluded from the scope of the order. Then, without warning, Commerce reversed course and attempted to make it appear in an "Issues and Decision Memorandum for the Final Results of the Fifth Administrative Review" that the scope had included nominal SSPC all along. We do not agree with the Court of International Trade's conclusion that Commerce's request for sales of products having a nominal thickness of 4.75 mm or more "indicated that it interpreted the scope measurements to be nominal." *ArcelorMittal*, 2011 WL 2713872, at *17. Commerce's discretion to define and clarify the scope of an investigation is limited by concerns for transparency of administrative actions. If Commerce chooses to modify the scope of an order during an investigation, it must make its intentions explicit. A mere request for additional data, without more, does not constitute a scope clarification.

The Court of International Trade did not give full weight to the manifest injustice of enlarging the scope of the proceeding in this off-hand manner. To do what Commerce has done here is to invite arbitrariness and uncertainty into the process by which Commerce administers its antidumping duty orders. Commerce is not at liberty to ignore the plain terms of an order in what appears to be, in retrospect, an effort to better reflect the intent of the petitioners. If Commerce is concerned about circumvention of the SSPC antidumping order, it should conduct a circumvention inquiry under 19 U.S.C. § 1677j. What it cannot do is "interpret" the order in a manner

that changes its scope, as it did here. *See Duferco*, 296 F.3d at 1095.

CONCLUSION

We reverse the Court of International Trade's judgment that substantial evidence supported Commerce's determination that the SSPC order is ambiguous, and hold that the plain meaning of the orders regarding the 4.75 mm thickness is a reference to actual thickness of products subject to the orders.

**REVERSED**