# United States Court of Appeals for the Federal Circuit

---

**VANDEWATER INTERNATIONAL INC.,**
*Plaintiff*

**SMITH-COOPER INTERNATIONAL, INC., SIGMA CORPORATION,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**ISLAND INDUSTRIES,**
*Defendant*

---

2023-1093, 2023-1141

---

Appeals from the United States Court of International Trade in No. 1:18-cv-00199-LMG, Senior Judge Leo M. Gordon.

---

Decided: March 6, 2025

---

CHRISTOPHER CURRAN, White & Case LLP, Washington, DC, argued for all plaintiffs-appellants. Plaintiff-appellant Sigma Corporation also represented by RON KENDLER, LUCIUS B. LAU, WALTER SPAK.

GREGORY SEAN MCCUE, Steptoe LLP, Washington, DC, for plaintiff-appellant Smith-Cooper International, Inc. Also represented by ZACHARY SIMMONS.

MEEN GEU OH, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by ANNE DELMARE, BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, LOREN MISHA PREHEIM; JARED MICHAEL CYNAMON, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

_____

Before DYK, MAYER, and REYNA, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* REYNA.

Dissenting opinion filed by *Circuit Judge* DYK.

REYNA, *Circuit Judge*.

Appellants, Smith-Cooper International, Inc. and Sigma Corporation, appeal the final judgment of the U.S. Court of International Trade, which affirmed the U.S. Department of Commerce's determination that steel branch outlets imported by Vandewater International Inc. fall within the scope of an antidumping duty order for "butt-weld pipe fittings." We affirm.

BACKGROUND

I. Scope Ruling Framework

U.S. trade statutes provide that an interested party may petition the U.S. Department of Commerce ("Commerce") and the U.S. International Trade Commission ("ITC") to initiate an antidumping duty investigation. 19 U.S.C. §§ 1673, 1673a(b). Generally, when an antidumping duty investigation results in a final affirmative determination of dumping by Commerce and material injury or threat of material injury by the ITC, Commerce will issue

an antidumping duty order imposing antidumping duties on U.S. imports of the merchandise that was subject to the investigation. *Id.* §§ 1673, 1673d(c)(2). When Commerce issues an antidumping duty order, it defines the scope of the order and "includes a description of the subject merchandise, in such detail as [Commerce] deems necessary." *Id.* § 1673e(a)(2). Commerce drafts the scope in general terms because it concerns the overall "class or kind" of merchandise subject to the order. *Meridian Prods. LLC v. United States*, 851 F.3d 1375, 1379 (Fed. Cir. 2017).

Key to this appeal, an interested party may request that Commerce issue a "scope ruling" on whether a particular product is outside of or within the scope of an existing antidumping duty order. *See* 19 C.F.R. § 351.225(a) (2020).[1] The implications are obvious: Imported products that are within the scope of a duty order are subject to antidumping duties upon importation. *Id.* § 351.225(l)(2), (l)(3). Conversely, products that are not within the scope of a duty order are not subject to antidumping duties upon importation. *See id.* § 351.225(l)(4). A scope ruling, therefore, is intended to clarify whether a particular product falls within or outside of the scope of the order. *Id.* § 351.225(a).

To determine if a product is within the scope of an order, Commerce follows a multi-part regulatory framework. *See id.* § 351.225. First, Commerce determines whether the language of the order itself unambiguously answers the scope question. *See Meridian Prods.*, 851 F.3d at 1381.

---

[1]    Unless otherwise noted, this opinion will cite to the 2020 version of this regulation for the remainder of this opinion. The 2020 version applied during the proceedings below. Commerce has since revised this regulation. *See* Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws, 86 Fed. Reg. 52,300 (Dep't of Commerce Sept. 20, 2021).

This step is sometimes referred to as the "(k)(0)" inquiry because it precedes the analyses under sections (k)(1) and (k)(2) of Commerce's regulation. *See id.*

Second, if the scope order language does not unambiguously answer the scope question, then Commerce proceeds to what is known as the "(k)(1) analysis." 19 C.F.R. § 351.225(k)(1). At this step, Commerce looks to the interpretive sources enumerated in 19 C.F.R. § 351.225(k)(1) to determine whether the product falls within the scope of the order. *Id.*; *Meridian Prods.*, 851 F.3d at 1382. These sources are the petition leading to Commerce's antidumping duty investigation, the investigation itself, prior scope determinations, and determinations by the ITC. 19 C.F.R. § 351.225(k)(1). If the information contained in the (k)(1) sources dispositively answers the question of whether the product at issue is within or outside of the scope of the order, then Commerce issues a final scope ruling on the matter. *Id.* § 351.225(h).

However, if Commerce finds the (k)(1) sources are nondispositive, it will proceed to a third step: It will consider the five additional criteria set forth in 19 C.F.R. § 351.225(k)(2). *See Meridian Prods.*, 851 F.3d at 1382. The "(k)(2) criteria" are: (i) the physical characteristics of the product; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed. *Id.* (citing 19 C.F.R. § 351.225(k)(2)). The (k)(2) criteria help to "determine whether a product is sufficiently similar as merchandise unambiguously within the scope of an order as to conclude the two are merchandise of the same class or kind." *Wirth Ltd. v. United States*, 5 F. Supp. 2d 968, 981 (Ct. Int'l Trade 1998), *aff'd*, 185 F.3d 882 (Fed. Cir. 1999). Commerce has discretion in how to balance the (k)(2) criteria. *Meridian Prods.*, 851 F.3d at 1382.

## II. ADD Order and Related Proceedings

On July 6, 1992, Commerce issued an antidumping duty order on certain steel "butt-weld pipe fittings" from China. *Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value; Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China*, 57 Fed. Reg. 29702 (Dep't of Commerce Jul. 6, 1992) ("ADD Order"). At issue in this appeal is the language "butt-weld pipe fittings" contained in the following portion of the ADD Order:

> The products covered by this order are carbon steel ***butt-weld pipe fittings***, having an inside diameter of less than 14 inches, imported in either finished or unfinished form. These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (e.g., threaded, grooved, or bolted fittings).

*Id.*, 57 Fed. Reg. at 29703 (emphasis added).

In 2009, Commerce issued a scope ruling concerning the ADD Order at the request of King Supply Co. ("King Supply Scope Ruling"). J.A. 873. King Supply argued that its pipe fittings were not "butt-weld pipe fittings" within the scope of the ADD Order because they were not used to join sections of piping. J.A. 873–74. Commerce disagreed with King Supply, noting that the language of the ADD Order did not limit pipe fittings to those that only joined piping sections, i.e., that this description was not an "end-use exclusion."[2] J.A. 877. Rather, Commerce noted that this

---

[2] An end-use exclusion refers to language in an antidumping duty order that "generally limit[s] the scope of [the order] based on the ultimate usage of the imported

was a description of a possible end-use. *Id.* Commerce then determined King's pipe fittings were "butt-weld pipe fittings." J.A. 875. We affirmed Commerce's interpretation of the ADD Order. *King Supply Co., LLC v. United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012).

In 2016, the ITC issued a "sunset review"[3] of the ADD Order, describing the subject merchandise as follows:

> Butt weld pipe fittings are used to connect pipe sections where conditions require permanent, welded connections. The beveled edges of butt-weld pipe fittings distinguish them from other types of pipe fittings, such as threaded, grooved, or bolted fittings, which rely on different types of fastening methods. When placed against the end of a beveled pipe or another fitting, the beveled edges of a butt-weld pipe fitting form a shallow channel that accommodates the "bead" of the weld that fastens the two adjoining pieces.

J.A. 622, "2016 Sunset Review." The ITC also noted in the sunset review the following common shapes of butt-weld pipe fittings:

> Carbon steel butt-weld pipe fittings come in several basic shapes, the most common of which are elbows, tees, reducers, and caps (figure I-1). Elbows

---

merchandise." *King Supply Co., LLC v. United States*, 674 F.3d 1343, 1345 n.1 (Fed. Cir. 2012).

[3] The ITC and "administering authorit[ies]" conduct periodic evaluations of antidumping and countervailing duty orders to determine whether the orders should remain in place. *See* 19 U.S.C. § 1675(c); *see also Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 101 F.4th 1310, 1320 (Fed. Cir. 2024). These evaluations are called "sunset reviews." *Saha Thai*, 101 F.4th at 1320.

are two-outlet fittings usually having a 45-degree or 90-degree bend, tees are T-shaped fittings having three outlets, and reducers are two-outlet fittings that connect pipes of two different diameters. Caps are used to seal the end of a pipe. There are further variations within each class of fitting based on differences in the size of one or more of the outlets (for example, there are reducing elbows and reducing tees).

J.A. 652.

### III. Proceedings before Commerce and the CIT

### A. Commerce's Scope Ruling

On May 17, 2018, Vandewater International Inc. ("Vandewater"), a U.S. importer, requested a scope ruling from Commerce, arguing that its steel branch outlets were not "butt-weld pipe fittings" subject to the ADD Order.[4] J.A. 167. As Vandewater's scope ruling request explained, its steel branch outlets have one side that is contoured, which allows that end of the steel branch outlet to set on (or through) the pipe "like a saddle." J.A. 169. The other end of the outlet, called the branch or outlet side, is formed with a threaded or grooved end and is intended to connect to something else, such as a sprinkler. *Id.* Below is a picture of a threaded steel branch outlet that was imported by Vandewater:

---

[4]    Although a party to the proceedings below, Vandewater is not a party to this appeal, having declared bankruptcy. *See* Sigma Opening Br. 19 (citing Voluntary Pet. for Non-Individuals Filing for Bankruptcy at 1, No. 21-14098 (Bankr. S.D. Fla. ECF Apr. 28, 2021)).



J.A. 170.

In contrast to its steel branch outlet, Vandewater argued in its scope ruling request that the two ends of a "butt-weld pipe fitting" are not contoured but rather beveled, as displayed in the image below.



J.A. 179.

According to Vandewater,

> [b]evels are needed on each end of the butt-weld pipe fitting itself *and* the part to which the butt-weld pipe fitting is to be welded, so that when the butt-weld pipe fitting and the adjoining part are

"butted" together, the bevels form a gap to fill with welding material.

J.A. 178 (emphasis in original).

When compared side-by-side, Vandewater argued that its steel branch outlet cannot be welded to a "butt-weld pipe fitting," as displayed in the image below:



J.A. 180.

On August 24, 2018, as part of Vandewater's scope proceeding, Commerce placed on the record the petition in the underlying antidumping investigation that gave rise to the ADD Order, and the 2016 Sunset Review. J.A. 3111.

Around this time, appellants Smith-Cooper International, Inc. ("SCI") and Sigma Corporation ("Sigma"), U.S. importers, requested scope rulings from Commerce that its products were not "butt-weld pipe fittings" under the ADD Order.

On September 10, 2018, Commerce issued its scope ruling in response to Vandewater's scope ruling request. *Final Scope Ruling on Vandewater International Inc.'s Steel Branch Outlets* (Dep't of Commerce Sept. 10, 2018) ("Scope

Ruling"), J.A. 131–42. Commerce determined that under a "plain reading" of the ADD Order, Vandewater's steel branch outlets were "butt-weld pipe fittings." J.A. 139. Commerce also noted that the petition, the 2016 Sunset Review, and the King Scope Ruling, all (k)(1) materials, supported its conclusion that Vandewater's steel branch outlets were "butt-weld pipe fittings" under the ADD Order. J.A. 139–41. Commerce then issued instructions to U.S. Customs and Border Protection ("CBP") to suspend liquidation of entries of Vandewater's steel branch outlets to ensure proper enforcement of the ADD Order and accurate assessment of duties. J.A. 4292–94.

Commerce separately issued scope rulings for SCI and Sigma, finding that the ADD Order covered their products as well. *Final Scope Ruling on Sigma Corporation's Fire-Protection Weld Outlets* (Dep't of Commerce Dec. 11, 2018), J.A. 3711–27; *Final Scope Ruling on Smith-Cooper International's Cooplet Weld Outlets* (Dep't of Commerce Dec. 20, 2018), J.A. 4081–98. These scope rulings are not at issue in this appeal.[5]

### B. Vandewater's Appeal to the CIT

Vandewater, Sigma, and SCI each appealed their respective Commerce's scope rulings to the U.S. Court of International Trade ("CIT"), which separately docketed each appeal. The parties then moved to consolidate their cases, principally arguing that all three appeals involved the same (k)(0) inquiry: whether the scope term "butt-weld pipe fittings" unambiguously excluded their products based on industry usage of the term "butt-weld." *See* J.A. 4111–12, J.A. 4099–4108.

---

[5]    Because these two scope rulings are not on appeal in this case, the dissent's focus on Commerce's analysis in these two scope rulings is misplaced. See Dissent at 2.

The CIT notified the parties via a letter that consolidation of the cases seemed unworkable but that it nonetheless was considering an "efficient dispositional path" for the three appeals. J.A. 4111–12. The CIT also noted its confusion as to the parties' interest in framing the appeal around the threshold (k)(0) issue. J.A. 4112. The CIT noted that the parties' initial position on the (k)(0) inquiry:

> indicate[d] that this [was] less a "legal" issue focusing on the scope language in a vacuum than it was a substantial evidence issue dependent on the administrative record (because the term "butt-weld" is not specifically defined in the scope and one must reference something beyond the scope to know what the term means).

*Id.* The CIT noted that it believed the actual issue was whether Commerce's (k)(1) analysis was supported by substantial evidence and if not, whether a remand was needed to conduct a full (k)(2) analysis. J.A. 4113. The CIT also cautioned that:

> to be perfectly candid, when the court reads the phrase "normal industry usage" for a scope term such as "butt-weld", it cannot help thinking that this must, in some way, implicate the (k)(2) factors. The court wonders how one would identify a clear "industry usage" for the phrase "butt-weld"—one that excludes Plaintiffs' products—without analyzing the (k)(2) factors.

*Id.*

The CIT then formally denied the motions to consolidate and ordered briefing in each of the three appeals on the (k)(0) inquiry, i.e., whether the scope term "butt-weld pipe fitting" has an unambiguous meaning excluding each plaintiff's products from the ADD Order. J.A. 4123, J.A. 4125, J.A. 4115. The CIT noted that this was a legal issue it would review de novo. J.A. 4115.

### C. CIT's (k)(0) Decision

On June 3, 2020, the CIT issued the same memorandum and order in all three docketed appeals concerning the (k)(0) issue. J.A. 143–48, "CIT's (k)(0) Decision." The CIT rejected the parties' argument that the scope term "butt-weld pipe fitting" has one clear, unambiguous meaning given industry usage of this term.[6] J.A. 147. First, the CIT noted that one of the parties, SCI, referred to branch outlets as a "threaded butt-welded outlet," a "grooved butt-welded outlet," and "butt-weld outlets," which weakened the parties' claim that uniform trade usage of "butt-weld" excludes steel branch outlets. *Id.* Second, the CIT noted that under a separate scope ruling, i.e., the "Sprink Scope Ruling," steel branch outlets like those at issue had been included since 1992 under a similar antidumping duty order covering butt-weld pipe fittings from Taiwan. *Id.* (citing *Carbon Steel Butt-Weld Pipe Fittings from Taiwan*, (Dep't of Commerce Mar. 25, 1992) (final scope ruling on Sprink, Inc. exclusion request)). According to the CIT, this also undercut the parties' argument that uniform industry usage of "butt-weld" excludes steel branch outlets. *Id.*

After issuing its (k)(0) Decision, the CIT then stayed SCI's and Sigma's appeals and proceeded with Vandewater's appeal. The CIT then considered the next question, whether Commerce correctly determined in its Scope Ruling that the (k)(1) sources dispositively included Vandewater's steel branch outlets within the scope of the ADD Order. *See Vandewater Int'l, Inc. v. United States*, 476 F. Supp. 3d 1357, 1359 (Ct. Int'l Trade 2020) ("Remand Decision").

---

[6] The parties interchangeably refer to "industry usage" and "trade usage" in this appeal. We do so as well.

### D. CIT's Remand Decision

On October 16, 2020, the CIT determined that Commerce's Scope Ruling was unsupported by substantial evidence and remanded the matter back to Commerce to conduct a full scope inquiry and evaluate the (k)(2) factors. *Id.* The CIT explained that conflicting evidence in the record precluded a finding that the (k)(1) sources were dispositive. *Id.* at 1361–62. The CIT noted that on the one hand, the Sprink Scope Ruling "would seem to be dispositive" that Vandewater's steel branch outlets fall within the scope of the ADD Order. *Id.* at 1361. The Sprink Scope Ruling included steel branch outlets virtually identical to Vandewater's within the scope of a companion antidumping duty order on butt-weld pipe fittings from Taiwan. *Id.* The CIT then noted that, on the other hand, other (k)(1) factors "do not really tell the court anything about the inclusion of steel branch outlets within the scope of the [ADD Order]." *Id.* at 1362 (discussing the petition language, the language from the 2016 Sunset Review, and the King Scope Ruling, a separate scope ruling under the ADD Order).

### E.  Commerce's Remand Results

On October 30, 2020, Commerce initiated the scope inquiry and reopened the record to provide interested parties an opportunity to submit comments and new information relevant to the (k)(2) criteria. J.A. 22. In over 100 pages, Commerce analyzed the (k)(2) criteria, including interested parties' submitted comments. J.A. 21–124. On July 22, 2021, Commerce found that, based on the (k)(2) criteria, Vandewater's steel branch outlets fall within the scope of the ADD Order ("Remand Results"). J.A. 124.

As the CIT predicted, evidence of industry usage came into play during the (k)(2) analysis. *See* J.A. 110–11, J.A. 113–15. For example, for the (k)(2) criteria concerning the expectations of ultimate purchasers, Sigma, as an interested party to Commerce's remand proceedings, argued that different industry standards apply to steel branch

outlets than to "butt-weld pipe fittings," which impacts consumer expectations. J.A. 110. Commerce rejected this argument, noting that because the scope of the ADD Order is not coextensive with any industry standard, an importer's characterization of applicable industry standards is "without merit." *Id.*

Commerce then determined that it was unnecessary to change its previous instructions to CBP, and that if the CIT affirms its Remand Results, CBP should continue any suspension of liquidation of entries of steel branch outlets imported by Vandewater. J.A. 116, J.A. 123. Vandewater appealed Commerce's Remand Results to the CIT.

### F.  CIT's Final Decision

SCI and Sigma moved to intervene in Vandewater's appeal to the CIT. In August 2021, the CIT granted SCI's and Sigma's motions. *See, e.g.*, J.A. 4264. On September 8, 2022, the CIT sustained Commerce's determination that Vandewater's products fall within the scope of the ADD Order based on the (k)(2) criteria. *Vandewater Int'l Inc. v. United States*, 589 F. Supp. 3d 1324, 1328 (Ct. Int'l Trade 2022) ("Final Decision"). The CIT also determined that SCI forfeited as untimely a challenge to Commerce's decision to not alter its suspension instructions to CBP. *Id.* at 1342–43. The CIT entered judgment accordingly. *Id.* at 1343.

SCI and Sigma appeal the final decision.[7] We have jurisdiction under 28 U.S.C. § 1295(a)(5).

---

[7]    As previously noted, Vandewater is not a party to this appeal.

## DISCUSSION

### I

This court reviews CIT rulings de novo, "stepping into its shoes and applying the same standard of review." *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011) (citation omitted). With respect to scope rulings, the question of whether a scope term is unambiguous is a question of law that we review de novo. *Whirlpool Corp. v. United States*, 890 F.3d 1302, 1308 (Fed. Cir. 2018); *Meridian Prods.*, 851 F.3d at 1382. The question of whether the product at issue meets the unambiguous scope terms is a question of fact that we review for substantial evidence. *Whirlpool*, 890 F.3d at 1308; *Meridian*, 851 F.3d at 1382. Substantial evidence means "such relevant evidence [that] a reasonable mind may accept as adequate to support a conclusion." *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1071 (Fed. Cir. 2001) (citation omitted).

### II

Appellants raise three issues on appeal. First, appellants challenge the (k)(0) analysis in Commerce's Scope Ruling and the CIT's (k)(0) Decision. *See* Sigma Opening Br. 24; SCI Opening Br. 16. Second, appellants challenge the CIT's Remand Decision, arguing that both Commerce and the CIT should have concluded that the (k)(1) factors dispositively exclude Vandewater's steel branch outlets from the scope of the ADD Order. *See* SCI Opening Br. 28.[8] As such, appellants argue that Commerce should not have reached the (k)(2) criteria. *Id.* Finally, only appellant SCI challenges Commerce's suspension of liquidation instructions. SCI Opening Br. 43. We address each point in turn.

---

[8]    Sigma joins and adopts SCI's arguments concerning Commerce's (k)(1) analysis. Sigma Opening Br. 39. For this reason, we cite only to SCI's briefing for this issue.

A

Appellants first challenge the (k)(0) analysis by Commerce and the CIT. *See* Sigma Opening Br. 24; SCI Opening Br. 16. They argue that, considering industry usage, the scope term "butt-weld pipe fittings" in the ADD Order unambiguously excludes Vandewater's steel branch outlets. *See* Sigma Opening Br. 24; SCI Opening Br. 16. We disagree.

As previously noted, we review de novo whether "the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists" in a scope order. *Meridian Prods.*, 851 F.3d at 1382. The relevant scope terms are "unambiguous" if they have "a single clearly defined or stated meaning." *Id.* at 1381 n.7. It is a "low threshold" for showing that Commerce justifiably found an ambiguity. *Novosteel SA v. U.S., Bethlehem Steel Corp.,* 284 F.3d 1261, 1272 (Fed. Cir. 2002).

Here, the ADD Order does not define or provide context for the adjective "butt-weld" when referring to "butt-weld pipe fittings." ADD Order, 57 Fed. Reg. at 29703. However, appellants argue that there is a "well-defined and consistently used term 'butt-weld' within the industry" that excludes Vandewater's steel branch outlets. SCI Opening Br. 18; *see also* Sigma Opening Br. 22.

An antidumping duty order may have significant impact in the marketplace, particularly in the industry sector(s) relevant to the product(s) investigated. Hence, "antidumping orders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry." *ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 88 (Fed. Cir. 2012). Context, including an "industry custom," such as industry standards or usage, can be helpful in interpreting language in a scope order. *See id.* This is because the primary purpose of an antidumping duty order is to provide notice to foreign exporters of what merchandise

is subject to duties. *Id.* Thus, the terms of an order should be consistent, when possible, with industry usage. *Id.*

However, when there is evidence of different industry customs, in other words, when there is no evidence of a "single clearly defined or stated" industry custom, such conflicting evidence cannot establish that a scope term has unambiguous meaning based on an alleged "well-defined and consistently" used industry custom. *See Meridian Prods.*, 851 F.3d at 1382. Additionally, conflicting evidence of industry custom is not an invitation for Commerce, or a reviewing tribunal, to find as a matter of fact which industry custom governs at the (k)(0) stage. *See ArcelorMittal*, 694 F.3d at 88 n.8. The (k)(0) inquiry is an exercise of legal interpretation. *Worldwide Door Components, Inc. v. United States*, 119 F.4th 959, 968 (Fed. Cir. 2024) ("The plain meaning of an antidumping . . . duty order . . . is a question of law reviewed de novo."); *Meridian Prods.*, 851 F.3d at 1382. Commerce, and even less the CIT or this court, should not turn that analysis into a factual inquiry about industry customs, which is more appropriately reserved for the (k)(1) or (k)(2) evaluations.[9] *ArcelorMittal*, 694 F.3d at 88 n.8. (noting that "consideration of industry jargon" during a (k)(0) analysis "is not the same as conducting a full-fledge analysis of the factors embodied" in a (k)(2) analysis). For if the CIT or this court could decide factual issues at the threshold (k)(0) inquiry, Commerce's primacy in scope rulings, which are "highly fact-intensive and case-specific," is inappropriately minimized. *King Supply*, 674

---

[9]    As the dissent notes, Commerce recognized the importance of considering industry usage during scope rulings at the (k)(1) inquiry, not at the threshold (k)(0) inquiry. *See* Dissent at 3 n.1. Commerce recently amended its regulations to allow for consideration of "industry usage" as a (k)(1) material. 19 C.F.R. § 351.225(k)(1)(ii) (2024).

18                    VANDEWATER INTERNATIONAL INC. v. US

F.3d at 1345; *see also Whirlpool*, 890 F.3d at 1308 (noting that the "meaning and scope of the Orders are issues particularly within Commerce's expertise and special competence"). Moreover, the (k)(0) inquiry could effectively subsume the (k)(1) and (k)(2) analyses, disrupting the current design of the scope inquiry. *See* 19 C.F.R. § 351.225 (2024). Such an outcome would frustrate, if not impede, the purpose and intent of the U.S. trade statutes.

Here, contrary to appellants' position, there is conflicting evidence of industry custom concerning "butt-weld pipe fittings." According to appellants, it is industry custom that a butt-weld pipe fitting be produced according to two industry standards, American Society for Testing and Materials ("ASTM") A234-82a and American National Standards Institute ("ANSI") B16.9. Sigma Opening Br. 34–36; SCI Opening Br. 41–43. According to appellants, because Vandewater's steel branch outlets do not conform to these standards, these products cannot be considered "butt-weld pipe fittings." Sigma Opening Br. 34–36; SCI Opening Br. 41–43.

Appellee United States argues that the industry does refer to steel branch outlets, like Vandewater's, as "butt-weld" products. *See, e.g.*, Appellee Br. 36–37. First, as appellee notes, SCI referred to steel branch outlets as "threaded butt welded outlet," a "grooved butt welded outlet," and "butt weld outlets." *Id.* at 11, 44–45. Additionally, appellee points to the 1992 Sprink Scope Ruling, where Commerce concluded that virtually identical steel branch outlets to Vandewater's were "butt-weld pipe fittings," albeit under a different scope order. *Id.* at 8, 45–46. And as the CIT noted in its (k)(0) Decision, the 1992 Sprink Scope Ruling would make "it hard for a reasonable mind to be persuaded that branch outlets could never be classified as butt-weld fittings because there is one, and only one, widely- and well-known 'trade usage' of the term 'butt-weld fittings' that excludes [Vandewater's] branch outlets." J.A. 147.

Given this record of disputed industry custom, we hold that the term "butt-weld pipe fittings" in the ADD Order is ambiguous.  Consideration of disputed industry usage is better suited in this case for the (k)(2) analysis.  And that is what happened here.  On remand to Commerce, the parties submitted evidence of industry usage in connection with various (k)(2) factors, such as consumers' expectations.  *See* J.A. 110.  Commerce, the factfinder in scope proceedings, reviewed and weighed this evidence, and determined that such evidence showed that Vandewater's steel branch outlets were "butt-weld pipe fittings" subject to the ADD Order.  J.A. 124.  Tellingly, appellants do not challenge Commerce's (k)(2) analysis as unsupported by substantial evidence.

B

Given that "butt-weld pipe fittings" is ambiguous, we proceed to the (k)(1) analysis, the second issue on appeal. Appellants argue that Commerce's determination in its Scope Ruling that the (k)(1) sources dispositively show that Vandewater's steel branch outlets are "butt-weld pipe fittings" is unsupported by substantial evidence.  *See, e.g.*, SCI Opening Br. 30–31, 35; SCI Reply Br. 16–17.  Appellants also argue that, in its Remand Decision, the CIT likewise erred in concluding that the (k)(1) sources were not dispositive.  SCI Opening Br. 28; SCI Reply Br. 16–17.  According to appellants, the (k)(1) sources dispositively show that Vandewater's steel branch outlets are not "butt-weld pipe fittings."  SCI Opening Br. 12, 28.  Thus, appellants argue, neither Commerce nor the CIT should have reached the (k)(2) factors.  *See* SCI Reply Br. 16–17.  We disagree.

When the (k)(1) factors are not "dispositive," Commerce must, in issuing its scope ruling, "further consider" the (k)(2) criteria set forth in section 351.225(k)(2).  *See* 19 C.F.R. § 351.225(k)(2).  As previously noted, the (k)(1) factors are the description of the merchandise contained in the antidumping petition, the initial investigation by

Commerce and the ITC, and the determinations of Commerce and the ITC. *Id.* § 351.225(k)(1). "Dispositive" means having "the quality or function of directing, controlling, or disposing of something." *Sango Int'l, L.P. v. United States*, 484 F.3d 1371, 1379 (Fed. Cir. 2007) (citing *Oxford English Dictionary* (2d ed. 1989)). Thus, to be "dispositive," the (k)(1) factors "must be 'controlling' of the scope inquiry in the sense that they definitively answer the scope question." *Id.*

In its Scope Ruling, Commerce found that the (k)(1) sources definitively showed that Vandewater's steel branch outlets are "butt-weld pipe fittings" within the scope of the ADD Order. J.A. 141. As explained below, we agree with the CIT that this finding is not supported by substantial evidence. Rather, substantial evidence supports a finding that the (k)(1) sources are non-dispositive as to this issue.

Some (k)(1) sources could indicate that Vandewater's branch steel outlets *are not* "butt-weld pipe fittings." For example, the petition and the 2016 Sunset Review note that a "butt-weld pipe fitting" should have three characteristics, which are missing from Vandewater's steel branch outlets. They are (1) two (or all) edges of a "butt-weld pipe fitting" having beveled edges, (2) a fitting that connects to the end of a pipe, and (3) the receiving pipe having beveled edges. J.A. 712 (the petition); J.A. 622 (2016 Sunset Review). As to this last point, appellants argue that the beveled edges of the fitting and the receiving pipe create the type of channel necessary for butt-welding. SCI Opening Br. 29.

On the other hand, other (k)(1) sources could indicate that Vandewater's steel branch outlets *are* "butt-weld pipe fittings." For example, despite its list of three characteristics of a butt-weld pipe fitting, the petition contains "Examples of Carbon Steel Butt-Weld Fittings," such as "saddles," that do not meet all three previously listed characteristics in the petition. *See* J.A. 707, J.A. 756. This

indicates that such characteristics may be merely exemplary, rather than necessary characteristics of a "butt-weld pipe fitting." Notably, Vandewater compared its steel branch outlets to a "saddle" in its scope ruling request. J.A. 23, J.A. 169.

Additionally, in the King Supply Scope Ruling, Commerce clarified that the same ADD Order at issue here does not limit "butt-weld pipe fittings" to those placed at the end of a pipe, i.e., the second characteristic. J.A. 135. Vandewater's steel branch outlets are not placed at the end of the pipe but rather are welded to openings on the side of a pipe. J.A. 177–81.

Finally, in the 1992 Sprink Scope Ruling, Commerce determined that products virtually identical to Vandewater's steel branch outlets were "butt-weld pipe fittings" under a separate antidumping duty order for butt-weld pipe fittings from Taiwan. And though the antidumping duty order was different than the one at issue here, as the CIT noted, the Sprink Scope Ruling is nonetheless evidence that "[f]or over 25 years . . . Commerce has treated steel branch outlets as butt-weld fittings." *Vandewater*, 476 F. Supp. 3d at 1361.

Thus, given that the (k)(1) sources are equivocal, substantial evidence cannot support Commerce's Scope Ruling that the (k)(1) sources dispositively show that Vandewater's steel branch outlets *are* "butt-weld pipe fittings." For this same reason, substantial evidence cannot support appellants' position that the (k)(1) sources dispositively show that Vandewater's steel branch outlets *are not* "butt-weld pipe fittings." Rather, we agree with the CIT's Remand Decision. Here, substantial evidence leads to only one conclusion: the (k)(1) sources are non-dispositive. For this reason, we affirm the CIT's Remand Decision for Commerce to consider the (k)(2) sources.

Notably, because appellants do not challenge Commerce's (k)(2) analysis in its Remand Results or the CIT's

decision sustaining Commerce's (k)(2) determination, we affirm the CIT's Final Decision that Vandewater's steel branch outlets are within the scope of the ADD Order.

C

Lastly, appellant SCI argues that even if Vandewater's steel branch outlets fall within the scope of the ADD Order, Commerce nonetheless erred in one additional respect in its (k)(2) remand determination. SCI Opening Br. 43–44. According to SCI, Commerce erred in noting that it would apply suspension of liquidation and cash deposit requirements to Vandewater's entries made prior to October 30, 2020, the date that Commerce's (k)(2) inquiry on remand was initiated. *Id.* at 44. SCI argues that Commerce may only impose suspension of liquidation for and collect cash deposits on entries made on or after October 30, 2020. *Id.*

SCI also argues that the CIT, in its Final Decision, erred in not addressing the merits of this argument. *Id.* at 13. The CIT determined that SCI forfeited its suspension of liquidation challenge by failing to raise this challenge before Commerce during the remand. *Vandewater*, 589 F. Supp. 3d at 1342. SCI argues that this Court should find no forfeiture and determine that suspension of liquidation and cash deposit requirements applies only to entries made on or after October 30, 2020. SCI Opening Br. 13.

We need not reach the issue of forfeiture or the merits because SCI's suspension of liquidation challenge is moot. *See Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1337–38 (Fed. Cir. 2007) (noting that federal courts decide only "actual controversies" and are not to "give opinions upon moot questions or abstract propositions"). It is undisputed that Vandewater did not have any unliquidated entries of steel branch outlets pre-dating Commerce's October 2020 initiation of the remand proceeding. *See* Appellee Br. 72; SCI Reply Br. 30. Thus, any alleged instruction by Commerce to apply suspension of liquidation and cash deposit requirements to Vandewater's

entries made prior to October 30, 2020, is moot since there were no unliquidated entries before that date.

SCI, however, argues that this issue remains live because Commerce's allegedly erroneous suspension instructions could somehow apply to SCI's products and have some allegedly harmful consequences for SCI. SCI Reply Br. 30 ("However, by explicitly engaging not only Vandewater, but also SCI and SIGMA, about their entries in the proceeding below, the CIT confirmed that it was considering the factual and legal disposition of all three companies' entries.").

Commerce's suspension instructions at issue in this appeal are addressed only to *Vandewater's* products, not SCI's products. Additionally, SCI's products are not subject to this appeal. As an intervenor, SCI cannot enlarge the issues before the court. *See Vinson v. Washington Gas Light Co.*, 321 U.S. 489, 498 (1944). Here, the issues on appeal stem from Commerce's scope ruling on Vandewater's products, not SCI's or Sigma's. Their appeals of Commerce's scope determinations concerning their products and any suspension of liquidation instructions remain stayed before the CIT. Thus, SCI and Sigma may pursue related arguments concerning their own entries in their respective proceedings before the CIT once the stay is lifted.

## CONCLUSION

We have considered appellants' remaining arguments and find them unpersuasive. We affirm the CIT's Final Decision sustaining Commerce's Remand Results that Vandewater's steel branch outlets are within the scope of the ADD Order.

## AFFIRMED

### COSTS

Costs against SCI and Sigma.

# United States Court of Appeals
# for the Federal Circuit

———————————

**VANDEWATER INTERNATIONAL INC.,**
*Plaintiff*

**SMITH-COOPER INTERNATIONAL, INC., SIGMA CORPORATION,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**ISLAND INDUSTRIES,**
*Defendant*

———————————

2023-1093, 2023-1141

———————————

Appeals from the United States Court of International Trade in No. 1:18-cv-00199-LMG, Senior Judge Leo M. Gordon.

———————————

DYK, *Circuit Judge*, dissenting.

This case involves interpretation of an antidumping duty order issued by the U.S. Department of Commerce that covered "carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches." Certain Carbon

Steel Butt-Weld Pipe Fittings from the People's Republic of China, 57 Fed. Reg. 29,702, 29,703 (July 6, 1992) ("Order").

Appellants, three separate importers, sought scope rulings, arguing that under the industry practice as specified in the American National Standards Institute ("ANSI") standard B.16.9 ("Factory-Made Wrought Buttwelding Fittings"), the term "butt-weld pipe fittings" did not include their imported steel branch outlets. They urged that butt-weld fittings necessarily have beveled ends, and the pipes, fittings, and valves to which they attach must also be beveled, so that the resulting gap may be filled with welding material for connection. In contrast, appellants claimed their pipe branch outlets lack beveled ends and are connected to holes cut into the sides of pipes instead of being affixed to a pipe's end.

Commerce's first scope ruling (the Vandewater ruling) is the only ruling before us. In this ruling, Commerce did not consider industry practice at all. *See* J.A. 137–41. The other two rulings illuminate Commerce's reasons for not addressing industry practice. In those rulings, Commerce declined to consider the ANSI standard because the Order itself made no reference to industry practice:

> [N]othing in the scope language or the (k)(1) sources limits the scope . . . to merchandise conforming to [ANSI] B.16.9 standards. In fact, the scope of the order makes no mention of industry standards. We recognize that the petition references [ANSI] B.16.9 standards in a footnote, however, this does not limit the scope language to include solely merchandise produced or manufactured to ANSI (or ASME) B.16.9 standards.

J.A. 3724–25 (Sigma Ruling) (footnote omitted); J.A. 4094 (SCI Ruling) (same).

The majority affirms on the ground that the term "butt-weld pipe fittings" in the Order was ambiguous because industry practice, in the majority's view, was not uniform. I respectfully dissent because Commerce clearly erred in refusing to consider industry practice, and we cannot affirm on a theory never addressed by Commerce that requires factual determinations.

I

Commerce makes scope rulings to determine whether certain imported merchandise is covered by an antidumping duty order. 19 C.F.R. § 351.225(a) (2018).[1] If an order uses a term with an industry-accepted meaning, that meaning governs. *See ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 88 (Fed. Cir. 2012); *see also Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017).

When interpreting the order's plain meaning in the industry, Commerce at the so-called (k)(0) step must consider "the way the language of the order is used in the relevant industry." *ArcelorMittal*, 694 F.3d at 88. That inquiry—distinct from full consideration of the (k)(2) factors—asks only "whether the [disputed term] has an industry-accepted meaning." *Id.* at 88 n.8. Commerce's analysis must stop after assessing the plain meaning of the order "when read *in light of industry practice.*" *Id.* at 89 (emphasis added).

---

[1]    Commerce recently amended the regulation setting the procedures to be followed in scope rulings. The new amendment recognizes the importance of trade usage, at least at the (k)(1) step. *See* 19 U.S.C. § 351.225(k)(1)(ii) (2024). We have no occasion here to discuss whether the new amendment is consistent with the statute.

Thus, industry standards play a critical role in interpreting antidumping duty orders, both in cases where an importer relies on industry standards, and where Commerce also does so. *See, e.g.*, *Saha Thai Steel Pipe Pub. Co. v. United States*, 101 F.4th 1310, 1327 (Fed. Cir. 2024). In the context of other issues, we have similarly approved Commerce's resort to industry standards to administer the antidumping laws. *See, e.g.*, *Risen Energy Co. v. United States*, 122 F.4th 1348, 1354 (Fed. Cir. 2024) (affirming Commerce's use of industry standards in determining normal value).

Contrary to Commerce's conclusion, industry practice is relevant to the plain-language inquiry regardless of whether an order specifically incorporates the industry practice. For example, in *ArcelorMittal*, we reversed Commerce's scope determination for failing to apply the relevant industry practice, even though the order there made no reference to industry practice. 694 F.3d at 86, 90–91. Similarly, in *OMG, Inc. v. United States*, 972 F.3d 1358 (Fed. Cir. 2020), we approved the use of dictionary definitions of a disputed term by the U.S. Court of International Trade to aid in its determination that Commerce correctly found the plain meaning of an order to unambiguously cover the subject merchandise. *See id.* at 1365–66. The use of such definitional sources to discern the meaning of plain language, even when the text at issue makes no reference to those sources, is an important part of the interpretive process. *See, e.g.*, *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001); *NSK Ltd. v. United States*, 115 F.3d 965, 974 (Fed. Cir. 1997).

Commerce's approach here was contrary to these cases.

## II

The majority fails to address this obvious error in Commerce's approach. Instead, the majority concludes that industry practice is irrelevant for a different reason, namely

that the term "butt-weld pipe fittings" is ambiguous be-cause the record contains "conflicting evidence of industry custom concerning 'butt-weld pipe fittings.'" Majority Op. 18.[2]

The majority makes this determination in the first in-stance even though Commerce made no finding as to ambi-guity.  It is not our role to determine whether industry practices are uniform.  Whether the industry uniformly uses the term "butt-weld pipe fittings" according to the ANSI standard presents a question of fact that Commerce, the entity entrusted with "primacy in scope rulings," *id.* at

---

[2]    The "conflicting evidence" on which the majority rests its ambiguity conclusion appears to be no more than an allegation by Island Industries ("Island"), an opponent of Vandewater's scope request, that one of the importers here, SCI, referred to certain of its products as "threaded butt-welded outlet[s]," "grooved butt-welded outlet[s]," and "butt-weld outlet[s]" in certain of its import documents. Majority Op. 18.  The majority also finds persuasive Com-merce's 1992 Sprink Scope Ruling, which concluded that products similar to appellants' steel branch outlets fell within the scope of a different antidumping duty order that used the term "butt-weld type fittings." *Id.*  Whether this suffices to establish a conflict in the trade's use of the term "butt-weld pipe fittings" is far from clear.  Appellants argue that the record is devoid of evidence corroborating Island's allegation that SCI used the term "butt-weld" to describe its products. *See* SCI Opening Br. 20.  The majority also elides the fact that the 1992 Sprink Scope Ruling should have little bearing here because the antidumping duty or-der in that prior ruling concerned a different term (i.e., "butt-weld **type** fittings").  Determining the existence of conflicting evidence for how the industry understands a particular term is a matter for Commerce, not this court, to decide in the first instance.

17, is obligated to resolve in the first instance.  But Commerce never addressed whether there was such a conflict. Commerce did not consider the significance of the proposed industry usage at all.

I would vacate and remand to Commerce to address whether industry standards resolve the scope of the antidumping duty order as a matter of plain meaning in the relevant industry at the so-called (k)(0) step, and to address whether appellants' merchandise fits within that industry-standard definition.  I respectfully dissent.